748 A.2d 1

**Donald WILLIAMS**

v.

**STATE of Maryland.**

**No. 380, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

March 9, 2000.

2

Stanley Neustadter, New York City (Geoffrey H. Genth, Kramon & Graham, P.A., on the brief), for appellant.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Argued before MOYLAN, ADKINS and THEODORE G. BLOOM (Ret., Specially Assigned), JJ.

**4**

MOYLAN, Judge.

As the mirage of apparent substance melts into illusion again and again, there unfolds before us on this appeal a desert of non-preserved might-have-beens. The appellant, Donald Williams, was convicted by a Baltimore County jury, presided over by Judge J. William Hinkel, of 1) the first-degree murder of his step-daughter, 2) the attempted first-degree murder of his wife, 3) conspiracy to commit first-degree murder, and 4) the use of a handgun in the commission of a violent crime. With respect to all of the crimes other than conspiracy, the appellant's role was that of an accessory-before-the-fact.

The appellant was tried jointly with his son, Maurice Williams, who was the principal in the first degree. The evidence supported the jury's conclusion that the appellant hired his son to kill Pamela Williams, who was the appellant's wife and the stepmother of his son and codefendant. The son was to share in the premiums collected by the appellant from two life insurance policies on the wife's life. In the ultimately botched murder attempt, Pamela Williams was seriously injured (blinded in one eye) but she survived. Pamela Williams's seventeen-year-old daughter, Tiffany Chisholm, was shot and killed, however, in a deliberate effort to eliminate her as an unexpected witness to the attack on her mother.

### "How Have I Failed to Preserve Thee? Let Us Count the Ways"

This appeal is unusual in that not one of the appellant's four primary contentions, some of which at least tentatively appear as if they might have had significant merit, has been preserved for appellate review. Involved, moreover, is not a single variety of non-preservation but a bounteous smorgasbord of non-preservations and waivers. On appeal, the appellant now argues

1) that the evidence was not legally sufficient to corroborate the testimony of the accomplice, Mark Bowie, and was,

therefore, not legally sufficient to permit the case to have been submitted to the jury;

2) that Judge Hinkel erroneously declined to instruct the jury on the necessity for corroborating an accomplice's testimony with respect to the conspiracy charge;

3) that the evidence was not legally sufficient to support the conviction for the murder of Tiffany Chisholm;

4) that Judge Hinkel erroneously permitted an out-of-court statement by Reginald Johnson to be introduced into evidence; and

5) that the appellant was prejudiced in four other regards, those contentions having been raised by his son and codefendant, Maurice Williams, and adopted by the appellant but not further elaborated on in the appellant's brief.

Although the effect of non-preservation is a constant, its instances in this case take various forms.

### Non–Preservation:
### Two Claims of Evidentiary Insufficiency

■ Two of the appellant's four primary contentions—1) that challenging the adequacy of the corroboration of the testimony of the accomplice and 2) that challenging the proof of the appellant's murderous *mens rea* in the case of Tiffany Chisholm—question the legal sufficiency of the State's evidence to have permitted the judge, as a matter of law, to submit the case generally and the murder charge specifically to the jury. It is clear beyond dispute that the appellant has not preserved for appellate review either challenge to the legal sufficiency of the State's evidence.

■ At the end of the State's case, the appellant did, indeed, move for a judgment of acquittal. Even that motion was in the broadest and most conclusory of terms: "I make a motion for judgment of acquittal, Your Honor." The question, however, of whether that motion satisfied Md. Rule 4–324(a) by "stat[ing] with particularity all reasons why the motion should be granted," *Bates v. State*, 127 Md.App. 678, 736 A.2d

407 (1999); *Brooks v. State*, 68 Md.App. 604, 515 A.2d 225 (1986), is not before us because that motion was effectively withdrawn by the appellant when he then introduced Defense Exhibit No. 4 relating to insurance policies taken out by the appellant on Pamela Williams's life. By introducing that exhibit, the appellant brought himself under the provisions of Maryland Rule 4–324(c), which provides:

> (c) **Effect of denial.** *A defendant* who moves for judgment of acquittal at the close of evidence offered by the State *may offer evidence* in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made. *In so doing, the defendant withdraws the motion.*

(Emphasis supplied). At the end of ·the entire case, the appellant made no further motion for a judgment of acquittal.

In dealing with an appeal in precisely the same procedural posture, the Court of Appeals in *Ennis v. State*, 306 Md. 579, 510 A.2d 573(1986), first noted, 306 Md. at 585, 510 A.2d 573, that the Maryland Rule has "been construed *to preclude appellate courts* of this state *from entertaining a review of the sufficiency of the evidence*, in a criminal case tried before a jury, where the defendant failed to move for judgment of acquittal at the close of all the evidence." (Emphasis supplied). Its holding, 306 Md. at 587, 510 A.2d 573, is unequivocal:

> In the instant case, appellant moved for judgment of acquittal at the close of the State's case. That motion was denied. Following that denial, the appellant put on her case. ° However, *she failed to renew her motion for judgment of acquittal at the close of all the evidence. Her failure to do so effectively precluded the trial court from considering her insufficiency contention.* Consequently, there was nothing for the Court of Special Appeals to consider; similarly, *there is nothing for us to consider* here. Art. 27, § 593; Md. Rule 4–324.

(Emphasis supplied).

Equally emphatic is *Lotharp v. State*, 231 Md. 239, 240, 189 A.2d 652 (1963):

Since no motion for judgment of acquittal was made at any stage of the trial there can be no review of the sufficiency of the evidence on appeal. Under the provisions of § 5 of Art. XV of the Constitution of this State, Code (1957), Art. 27, § 593, and Maryland Rule 755, *an appellate review of the sufficiency of the evidence* in a criminal case tried by a jury *is predicated on the refusal of the trial court to grant a motion for judgment of acquittal.*

(Emphasis supplied).

■ There is no Maryland case in which an appellate court of this State has ever even examined the merits of a challenge to the legal sufficiency of the State's evidence following a criminal conviction by a jury when the defendant had failed to make a timely motion for a judgment of acquittal. Although we would not be inclined to overlook the non-preservation of the current challenge even if we had the discretion to do so, this principle of non-preservation is not even discretionary. The Court of Appeals could not have been more clear in *Wersten v. State,* 228 Md. 226, 229, 179 A.2d 364 (1962):

However, this was a jury trial and no motion for a judgment of acquittal was made; hence *we are not at liberty to pass upon the sufficiency of the evidence.*

(Emphasis supplied).

Although there is no instance of a Maryland appellate court's ever applying the "plain error" exception so as to entertain a non-preserved challenge to the legal sufficiency of the State's evidence, it is significant that in this case the appellant does not even invoke "plain error." In the discussion of these two contentions in the appellant's brief, there is no mention or even allusion to either preservation generally or to the "plain error" exemption from the foreclosing effect of non-preservation. Even in the face of the State's argument, in its brief, that neither sufficiency challenge has been preserved for appellate review, the appellant's reply brief again fails even to mention the subject with respect to these two contentions.

**8**

Despite our holding that neither of these first two contentions has been preserved for our review, we are nonetheless constrained to note that one of them—that involving his homicidal *mens rea* in the case of Tiffany Chisholm—appears, at least on cursory observation, as if it might have had some substantial merit.[1]

Although it seems unlikely that the appellant could totally escape complicity for the killing of Tiffany Chisholm even if he had not anticipated it, *Sheppard v. State*, 312 Md. 118, 121–22, 538 A.2d 773 (1988); *Grandison v. State*, 305 Md. 685, 703–04, 506 A.2d 580 (1986); *Veney v. State*, 251 Md. 159, 174, 246 A.2d 608 (1968); *Fabian v. State*, 235 Md. 306, 317, 201 A.2d 511 (1964), it might turn out, on a closer examination of the merits, that there would still remain a question as to what precise homicidal *mens rea* he possessed and at what particu-

---

1. The other contention—that challenging the adequacy of the corroboration of the accomplice's testimony—appears, at least on surface examination, to have been less weighty. On the issue of legal sufficiency (unlike the issue of entitlement to a jury instruction, see *infra* ), the evidence of "slight" corroboration need not be particularly persuasive; it need only be a *prima facie* case arguable enough to let the jury consider the question of corroboration. It must have some tendency "either 1) to identify the accused with the perpetrators of the crime or 2) to show the participation of the accused in the crime itself." *Turner v. State*, 294 Md. 640, 643, 452 A.2d 416 (1982).

The evidence was abundant to establish Maurice Williams as the first-degree perpetrator of the crimes. Indeed, in his separate appeal, Maurice Williams does not even challenge the legal sufficiency of the evidence against him. The father-son relationship between the appellant and Maurice Williams plus the testimony of Linda Butler putting the two of them together in conversation the day after the shootings had some tendency "to identify the [appellant] with the perpetrator of the crime."

The two life insurance policies on the life of Pamela Williams, in the amount of $95,000 and $100,000 respectively, plus the testimony of Pamela Williams about mutual threats of divorce three months before the shooting and her announced intention to the appellant that she "just wanted out" had some tendency to show that the appellant had a motive for instigating the crime. Although the jury may be admonished to view the testimony of an accomplice with skepticism, only "slight" corroboration is required to permit the jury at least to review the testimony. *Collins v. State*, 318 Md. 269, 280, 568 A.2d 1 (1990); *Turner v. State, supra*, 294 Md. at 643, 452 A.2d 416; *Brown v. State*, 281 Md. 241, 246, 378 A.2d 1104 (1977).

lar level his homicidal guilt (first-degree murder, second-degree murder, manslaughter) would be established.

This conceivably could have been the occasion to explore the still uncharted waters of second-degree murder pursuant to the common law felony-murder doctrine. The planned murder of Pamela Williams would certainly have been a violent and life-endangering felony. If Tiffany Chisholm was killed in the course of its attempted perpetration and for the purpose of eliminating her as a witness, the *mens rea*-generating capacity of the common-law felony-murder doctrine might well have pertinence. There would still be involved, of course, at least a question as to the level of guilt of an accessory before the fact who had not anticipated that particular homicide. Because of non-preservation, however, it would be inappropriate even to speculate further about a question that might require a small treatise by way of resolution. It is enough to note that the issue at least seems worthy of having been preserved for further examination.

To be sure, even if this contention had been preserved for appellate review and even if the appellant had prevailed on the merits, the only conviction that would apparently have been affected would have been that for the first-degree murder of Tiffany Chisholm. The other three convictions would not have been influenced by the fortunes of the homicidal *mens rea* of the appellant in the case of Tiffany Chisholm. That limitation, however, does not vitiate the potential significance of the contention.

### Non–Preservation: A Challenge to Jury Instructions

■ A third of the appellant's four primary contentions is that Judge Hinkel erroneously failed to instruct the jury, with specific reference to the conspiracy charge, that it was required to find that the testimony of the alleged accomplice, Mark Bowie, was corroborated before it could fairly consider such testimony against the appellant. Once again, non-preser-

vation, like the head of Medusa, stares at us with a paralyzing gaze.

Mark Bowie was the key State's witness. Mark Bowie was the accomplice of Maurice Williams at the time of the shootings. Indeed, he entered a guilty plea to murder in the second degree, as a principal in the second degree. At the conclusion of the trial, the appellant requested that Judge Hinkel instruct the jury on the requirement that the testimony of an accomplice be corroborated. Specifically, the appellant asked the court to read to the jury § 311A of the *Maryland Pattern Jury Instructions: Criminal.* At that point, the issue seemed to be a simple one: Mark Bowie either was or was not an accomplice. The State did not object to the instruction being given generally but sought to inject the distinction that Mark Bowie was a possible accomplice with respect to the consummated crimes but had not been a participant and, therefore, was not an accomplice with respect to the antecedent conspiracy. The State argued that although Mark Bowie's testimony needed to be corroborated with respect to the other three charges, it did not need to be corroborated to be considered on the conspiracy charge.

The appellant made no argument to counter that distinction. He remained completely passive with respect to it. At one point, after counsel for Maurice Williams opposed any instruction on Mark Bowie's possible status as an accomplice, Judge Hinkel sought to ascertain which of the two codefendants had requested the instruction as to accomplice testimony. Counsel for the appellant replied:

> Mr. Stange [Counsel for appellant]: It was my requested instruction.
>
> The Court: For what purpose?
>
> Mr. Stange: Because *we believe he's an accomplice.*
>
> The Court: *As to what?*
>
> Mr. Stange: *At least as to murder.*

(Emphasis supplied). That is a far cry from his present argument. Judge Hinkel agreed with the State as to the propriety of the distinction and accordingly gave the jury the

following preliminary advice before reading to them the Pattern Jury Instruction itself:

> The Court: You have heard testimony from Mark Bowie, who is alleged to be an accomplice in this case. That has to do with the charge of murder. So that this instruction that I give to you with respect to an accomplice does not apply to conspiracy, but applies to the charge of first degree murder.

After Judge Hinkel finished instructing the jury, he called counsel to the bench and the following colloquy took place:

> The Court: So while we're all lined up here, anything else on the instructions:
>
> The State: No.
>
> Counsel for Donald Williams: No, sir.

On the surface of things, the distinction requested by the State and made by the court initially seemed to be a reasonable one. There was a strong inference that Mark Bowie was Maurice Williams's accomplice at the time of the shootings. The only evidence with respect to the formation of the antecedent conspiracy, however, was that the appellant had approached Mark Bowie a full month before the shootings and that Mark Bowie had expressly declined to get involved in any way.

Before this Court, the appellant now argues, more subtly, that even though Mark Bowie may not have been a member of the original conspiracy, he may nonetheless have joined the conspiracy at the eleventh hour as he drove Maurice Williams to the crime scene. That nuance with respect to last-minute conspiratorial involvement, however, was never argued by the appellant to Judge Hinkel and was never brought to the judge's attention in any way. The nuance may have validity but it is not something that necessarily leaps off the page. The appellant was obviously unaware of the nuance he now advances or he would never have replied that he thought he was entitled to the accomplice instruction "at least as to murder," which is exactly what he got.

In holding that the appellant has not preserved for appellate review any objection to the jury instruction as given by the court, moreover, we are not treating the appellant's answer, "No, sir," as an affirmative acquiescence in the instruction. The presence of the word "else" in the judge's inquiry might conceivably create some ambiguity as to what exactly the appellant was asked and, therefore, as to whether the appellant expressly acquiesced. It is, rather, the absence of any affirmative objection by the appellant at any time after the issue of the distinction arose that is foreclosing. From the moment the distinction was first proposed by the State through the court's decision to make the distinction, the actual giving of the instruction with the prefatory distinction, and the ensuing pause during which exceptions could be registered, the appellant evidenced no disagreement or chagrin whatsoever. His only comment was that he was entitled to the instruction "at least as to murder." That position was completely in line with the distinction ultimately made.

Even though the appellant initially requested an instruction on corroboration, the failure of the appellant to object after the issue of the distinction was introduced and after the instruction containing that distinction was given is, we hold, the same as the failure of a defendant to object to a reinstruction even after having objected to the original instruction. In *Collins v. State*, 318 Md. 269, 568 A.2d 1 (1990), the defendant made a timely objection to the trial judge's instruction to the jury on the subject of reasonable doubt. The court then reinstructed the jury and the defendant lodged no objection to the reinstruction. Even though the trial judge was generally alerted as to the existence of the issue, under the circumstances the Court of Appeals held squarely, 318 Md. at 284, 568 A.2d 1, that the defendant there had not preserved for appellate review his challenge to the court's instructions on reasonable doubt:

> *Counsel's failure to except to the reinstruction is indicative of an acceptance and approval of the amended form used. Under these circumstances, defense counsel has failed to preserve the challenge to the court's instructions on reason-*

*able doubt.* Maryland Rule 4–325(e) provides that "no party may assign as error the giving or failing to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." (Emphasis supplied).

In *Bowman v. State,* 337 Md. 65, 650 A.2d 954 (1994), the trial judge instructed the jury on the subject of the imperfect defense of others. Defense counsel there evidenced some chagrin at the instruction but did not particularize it. He nonetheless did state that "even though you touched upon it, you really didn't go into a more specific kind of imperfect defense of others. But that's my only comment. I think it was a little sketchy even though you incorporated some of it, but it wasn't exactly what I had in mind." Again, the mere fact that the judge knew that imperfect defense was somehow an issue in the case was not *ipso facto* enough to preserve the issue for appellate review. When the trial judge then indicated that he was not going to give any further instructions, defense counsel, instead of objecting, said simply, "Thank you":

> The Court: Okay. Again, I think the instructions as given are sufficient and I'm declining to give any further instructions.

> [Defense Counsel]: Thank you, Your Honor.

337 Md. at 68, 650 A.2d 954.

In holding that such undifferentiated angst followed by a "Thank you" was not enough to preserve the challenge to the instruction for appellate review, Judge Raker, 337 Md. at 68–69, 650 A.2d 954, was very emphatic:

> As the record indicates, defense counsel made no express request, in writing or orally, for an instruction on "imperfect" defense of others. He merely stated to the court that the instruction as given was not "exactly what [he] had in mind." Furthermore, counsel did not bring to the court's attention the portion of the instructions which he thought

was "sketchy," nor did he state to the court in what manner the instructions should be amended.

 . . .

Here, *the court conferred with counsel at the bench after the instructions were given* but before the jury retired. *By failing to offer specific additional instructions at this time, appellant waived his objection.* We therefore hold, in accordance with Maryland Rule 4–325, that the issue is not preserved for our review.

(Emphasis supplied).

This Court has held that it is not enough that the trial judge be generally alerted to the subject in issue. In *Young v. State,* 14 Md.App. 538, 288 A.2d 198 (1972), an objection was lodged to the judge's initial instruction on the jury's function as judge of the law and the facts. After an extended discussion, the trial judge gave a supplementary instruction and "no exception was taken to the supplementary instructions." In holding that the defendant's challenge to the jury instructions had not been preserved for appellate review, Judge Orth said for this Court, 14 Md.App. at 565, 288 A.2d 198:

He now construes the supplementary charge as telling the jury that they were not the judge of the law as it pertains to responsibility for criminal conduct but were bound by the statutory definition and that such definition could not be disregarded in arriving at a verdict. Here again, *there being no objection to the supplementary instruction* as provided by § f of Rule 756, *Young may not assign error as of right.*

(Footnote omitted; emphasis supplied).

The appellant's challenge to the jury instruction in this case was not preserved for appellate review. Once again, the appellant does not even ask us to consider the possibility of "plain error." He argues that his objection to the ultimate instruction was, indeed, preserved by virtue of his initial and general request for an instruction. He does not argue, even as a contingent alternative, a "plain error" exemption from the

preservation requirement in case the preservation issue should be decided against him.

Again, however, we cannot help but note that if the contention had been preserved, it may have had some merit. There was at least a genuine dispute of fact as to whether Mark Bowie ultimately joined the conspiracy and was, therefore, an accomplice with respect to it. In such a circumstance, where a witness might or might not be an accomplice, the defendant could be entitled to a conditional instruction. In this regard, we observed in *Trovato v. State,* 36 Md.App. 183, 187–88, 373 A.2d 78 (1977):

> The permissibility of such a finding would simply entitle the appellant in a jury trial to an instruction, upon proper request, to the effect that if the jury found the witness to be an accomplice, they must then find independent corroborative evidence linking the appellant to the crime. The fact that the evidence was legally sufficient to permit the finding that the witness was an accomplice does not imply that the evidence could not also have been legally sufficient to permit the finding that the witness was not an accomplice. The fact finder was entitled to resolve that question either way.

On the other hand, even if this contention had been preserved for appellate review and even if the appellant had prevailed on the merits, the apparent impact would have been only on the conspiracy conviction and not on the other three convictions. Such limited applicability, however, would not divest the contention of significance.

The fact that the jury presumably found, on the other hand, that the testimony of Mark Bowie was, indeed, corroborated with respect to the other three charges, on which it had been fully advised as to the need for corroboration, might make the appellant's argument with respect to the conspiracy conviction moot. The corroboration of an accomplice's testimony is a unitary phenomenon and not something that varies from charge to charge. If the jury actually found adequate corroboration generally, the failure to have instructed them that they had to find it with respect to a particular count may have been

rendered meaningless. The appellant's present contention might have had more compelling merit if the jury had convicted him of conspiracy, as to which they had not been instructed as to the need for corroboration, but had acquitted him of all other charges, as to which they had been so instructed.

It is not necessary for us to speculate, however, as to how this contention might have been resolved on its merits if the merits were to have been considered. It is enough to note that cogent arguments could have been mounted in either direction and that the contention was at least worthy of being preserved for serious analysis.

## Non–Preservation:
## Subsequent Waiver of an Evidentiary Challenge

The appellant's final fully developed contention challenges the admission into evidence, through Detective Jay Landsman, of a five-page written statement (in question and answer form) given to the police by Reginald Johnson, a witness for the State. The shootings in this case took place on the night of August 29–30, 1990. The investigative trail then went cold for almost eight years. During the intervening years, at some-time in 1993 or 1994, Maurice Williams, the gunman, had a critical conversation with Reginald Johnson, in the course of which Maurice Williams made damaging admissions as to his role in the shootings. In addition to admitting his own guilt, Maurice Williams also implicated the appellant. The police only learned of these admissions on March 20, 1998 when Detective Landsman interviewed Reginald Johnson and took the statement now in question.

At trial, Reginald Johnson testified, without objection, as to the incriminating conversations Maurice Williams had with him in 1993 or 1994. The present contention involves the State's supplementation of Johnson's testimony by introducing into evidence, through Detective Landsman, the March 20, 1998 written statement given by Johnson to the police.

The appellant before us makes a two-pronged attack on the introduction of the written statement. He claims that it was error to have admitted the statement because it did not qualify as that exception to the Rule Against Hearsay traditionally known as "Past Recollection Recorded" and now codified as Md. Rule 5–802.1(e). He also claims that it was error to have admitted the written statement because it violated his right to confrontation under the Sixth Amendment of the United States Constitution, as implemented by *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Once again, the appellant finds himself in the compromising posture of not having preserved for appellate review his objection in either of these regards. Indeed, his position is "twice-curst." In the first instance, he did not adequately object to the introduction of the written statement on either of the particularized grounds he now argues before us. In the second place, even if he had, *arguendo,* properly noted an initial objection, that objection was waived when the same evidence came in on other occasions, both earlier and later, without objection.

Closely intertwined with all of this discussion is a redaction problem, raised not by the appellant himself but by Judge Hinkel *sua sponte* on the appellant's behalf and based on classic hearsay grounds. Jumbled together, all of these considerations create a mare's nest of confusion. We shall try as best we can to isolate the sub-issues into self-contained compartments.

## A. Past Recollection Recorded:

 Reginald Johnson testified as a State's witness on the second day of trial, February 18, 1999. He had been a co-worker and social friend of Maurice Williams for a number of years. He was familiar with the 1990 murder of Maurice Williams's stepsister and the attempted murder of his step-mother and with the rumors swirling about the case at that time and in the years that followed. His critical testimony

concerned a conversation he had with Maurice Williams some-
time in 1993 or 1994, in the course of which Maurice Williams
made damaging admissions. In his testimony, Johnson relat-
ed the following, with no objection being lodged by either the
appellant or Maurice Williams:

A: Well, he just said *he was involved with it and it was
something to do with some insurance money.* And
that Tiffany getting killed was a mistake.

Q: Okay. Did he get into more detail than that?

A: No. I can't recall going into deep detail.

(Emphasis supplied).

When Johnson indicated that he could not "recall going into
deep detail," the State showed him a copy of his written
statement to the police of March 20, 1998. Initially, the
statement was not offered or received in evidence but was only
used as a stimulus to refresh the witness's present recollec-
tion. *Baker v. State,* 35 Md.App. 593, 598–605, 371 A.2d 699
(1977). In that capacity as a memory aid, it had at least
partial success:

Q: Do you recall making a statement, a written statement
about that?

A: Yes.

Q: If I could have this marked as State's exhibit. And
counsel has been provided a copy. I'm going to ask you
to look through this and *see if it refreshes your memo-
ry* as to what Maurice told you that night.

A: *Yes, I recall most of it.*

Q: Do you recall what Maurice told you about what hap-
pened?

A: Some of it.

Q: Some of it you recall and some of it you don't?

A: Yes.

Q: What part of it do you recall?

A: Well, I remember me asking how he got there.

Q: What was his response?

A: He told me that Mark Bowie took him out there to Reisterstown Mall. *I remember mentioning something about insurance and I don't remember how much.*

Q: *Did you mention insurance or did he mention insurance?*

A: *He mentioned it.*

 . . .

Q: And you said that he said that Tiffany was an accident? How did he say that?

A: Something like it was a mistake or she knew too much or something like that or something to that effect.

(Emphasis supplied).

The appellant did not object to that testimony by Reginald Johnson, notwithstanding the fact that the references to insurance circumstantially linked him to the shootings. It had already been established that the appellant was the beneficiary of the life insurance policies on his wife's life.

Johnson's trial testimony was not in any way inconsistent with what he had said in his signed statement to the police. As far as his recounting of the admissions made by Maurice Williams was concerned, his trial testimony was almost, but not quite, as extensive as his written statement. In shifting gears from using the statement as a stimulus to refresh present recollection to offering it in evidence as an instance of past recollection recorded, the State developed from Johnson that looking at the statement did not refresh his recollection totally. He did, however, remember giving the statement. He read each of the five pages of his statement and signed each page at the bottom. He vouched for the fact that his signature attested to the writing as being "in fact correct." At that point, the State offered the written statement in evidence.

Counsel for the appellant, as well as counsel for the codefendant, said, "Objection." Beyond that, the nature of and the grounds for the appellant's objection are a mystery:

Mr. Brown: Objection.

Mr. Stange [Counsel for appellant]: *Objection.*

The Court: I will see you here.

Whereupon, Counsel along with Donald Williams approached the bench for a bench conference.

Mr. Stange: *Witness is on the stand—*

The Court: I know.

Mr. Stange:—*to testify.*

(Emphasis supplied). That was the only objection to Johnson's written statement that the appellant ever made.

From the subsequent colloquy between Judge Hinkel and counsel for the codefendant, it seems clear that their disagreement was over whether the statement would qualify as a hearsay exception pursuant to Rule 5–802.1(e), which reads, in pertinent part, as follows:

> The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:
>
> . . .
>
> (e) A statement that is in the form of a memorandum or record concerning a matter about which the witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, if the statement was made or adopted by the witness when the matter was fresh in the witness's memory and reflects that knowledge correctly.

At the end of the discussion, in which the appellant did not join, the court concluded:

> The Court: [T]his one I think is admissible under that rule that if it is his statement and he says it is his statement and it can't refresh his recollection, then it can come in. So I will allow it in.
>
> Mr. Brown [Counsel for codefendant]: Very well.

The appellant entered no objection to Judge Hinkel's ruling.

The appellant now argues that the statement failed to qualify for admissibility under Rule 5–802.1(e) in two regards.

He claims first that there was an inadequate showing of flawed memory, to wit, with respect to "matters about which the witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately." See, however, *Mouzone v. State,* 294 Md. 692, 701, 452 A.2d 661 (1982)(to qualify a past recollection recorded, the proponent must show only some impairment of present recollection); *Sanders v. State,* 66 Md.App. 590, 599, 505 A.2d 557 (1986)(it is only necessary to show "some impairment of memory").

The appellant also claims that a three-to-four-year lapse of time between the event described and the making of the memorandum disqualified it as a statement made "when the matter was fresh in the witness's memory." Had the issue been preserved for appellate review, the statement might arguably have been vulnerable in this regard, notwithstanding *Bloodsworth v. State,* 307 Md. 164, 189–92, 512 A.2d 1056 (1986)(the language of *Bloodsworth* as to the lapse of time going only to weight, not admissibility, points in one direction; the actual facts in *Bloodsworth,* a mere two-day lapse between the event and its memorialization, points in the other direction.)

Before Judge Hinkel, however, the appellant did not even mention Md. Rule 5–802.1(e) or its earlier incarnation as the past recollection recorded exception to the hearsay rule. The appellant did not make either of the more nuanced criticisms of the statement he now advances. For that matter, neither did the appellant's codefendant, arguably permitting the appellant to piggy-back on the codefendant's argument.

Deferring for a moment our discussion of the subsequent decision of Judge Hinkel to have part of the statement redacted, the question of the statement's general admissibility never again arose. We hold that the appellant's present attack on the statement as somehow violating Md. Rule 5–802.1(e) has not been preserved for appellate review.

## B. Sixth Amendment Confrontation:

In arguing that Judge Hinkel erroneously permitted the statement given by Reginald Johnson to the police on March 20, 1998 to be introduced into evidence and to be read to the jury by Detective Landsman, the appellant now advances, for the first time on appeal, the additional argument that the admission of the statement violated his Sixth Amendment right to confrontation. He invokes the Supreme Court cases of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998); and the Maryland decision of *In re Montrail M.,* 87 Md.App. 420, 589 A.2d 1318 (1991).

The written statement in question consists primarily of admissions made to Reginald Johnson by Maurice Williams in which Maurice Williams acknowledges his own guilt. To the extent to which some of those admissions also implicate the appellant, however, the appellant now claims that since Maurice Williams never took the stand, the appellant was thereby denied the right to confront his accuser.

The appellant's problem is that he never raised before Judge Hinkel any objection based on the Confrontation Clause. We have painstakingly set out every pertinent word by court or counsel from the time the State first offered the written statement during the testimony of Reginald Johnson on February 18 through Judge Hinkel's ultimate ruling that it was admissible. The only issue on the table dealt with when and how a statement utilized initially as a stimulus for present recollection refreshed might, when it partially fails in that regard, ripen into an exception to the hearsay rule on the ground that it is then an instance of past recollection recorded. There was no mention by anyone of the Sixth Amendment or the Confrontation Clause or *Bruton v. United States* or any state or federal progeny of *Bruton.* Such an issue was simply not before the court.

When Judge Hinkel subsequently raised the issue of redacting several designated portions of the statement before it was read to the jury, a subject that we shall discuss more fully *infra* in another context, there was no mention by appellant's counsel, by counsel for the codefendant, by the court, or by the State of any problem related to the Confrontation Clause or to *Bruton.* The distinction then being drawn for redaction purposes was between bad hearsay (where the rumor mill was the source) and good hearsay (that which qualified as an admission by a party opponent). There was no distinction being discussed between what was admissible against one codefendant but not against another. A *Bruton*-type problem was not remotely alluded to by anyone.

Because Judge Hinkel's purpose, when he *sua sponte* raised the issue of redaction, was so clearly that of distinguishing the hearsay declarations where Maurice Williams had been the source (which were not to be redacted regardless of whom they implicated) and the hearsay declarations that had emanated from either the rumor mill or from James Howard (which were to be redacted), we are constrained to note our chagrin at the mischaracterization of Judge Hinkel's purpose in the appellant's reply brief, a mischaracterization that has no basis in fact: "When the trial judge realized that the proceedings might be imperiled by incipient *Bruton* error in reading the entirety of Reggie's statement, he ordered reference to the defendant redacted, and the prosecutor agreed to 'deal with it.'" There is no basis for concluding that Judge Hinkel "realized" the peril of or was attempting to deal with an "incipient *Bruton* error."

■ The danger of such a blatant mischaracterization is that it increases the likelihood that some appellate tribunal might invoke the "plain error" exemption from the preservation requirement by giving the false impression that the trial judge was fully alerted to a possible violation of the Confrontation Clause and that the failure of a defendant to alert the trial judge to the existence of a *Bruton* issue, therefore, made no difference. The question of whether a judge has been

alerted to, or is *sua sponte* aware of, the existence of a particular legal issue in a case is one of the factors that may have an important bearing on a "plain error" analysis. Potential *Bruton* problems were not in any way a part of the redaction discussion and the assertion that they were in Judge Hinkel's mind has no basis in fact.

Although the evidentiary ruling that the written statement was to be admitted came in the course of the testimony of Reginald Johnson on February 18, the statement itself was not actually read into evidence until Detective Landsman took the stand on February 22. At that time, there was no objection to his reading the statement by anyone on any ground. *A fortiori*, it follows that the appellant raised no issue with respect to *Bruton v. United States* or the Confrontation Clause.

Indeed, even when the appellant raised the admission of the written statement as one of his grounds to support his motion for a new trial on April 20, he did not argue a *Bruton* violation. His attack on admissibility at that hearing, not pursued on this appeal, was two-fold. He claimed that the admissibility ruling was on the basis of Md. Rule 5–802.1(e) and that that Rule, which became effective on July 1, 1994, should not have been applied to the trial of a crime that occurred prior to that effective date. His second attack on admissibility was based on the fact that Reginald Johnson was not a "turncoat witness" within the contemplation of *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993). His argument at that hearing did not raise the issue of the Confrontation Clause or of *Bruton v. United States*.

We hold that no objection to the written statement on the basis of the Confrontation Clause has in any way been preserved for appellate review in this case.

## C. Waiver of Objection to Evidence When It Is Otherwise Received Without Objection:

Even if the appellant were, *arguendo*, deemed to have preserved his objection to Judge Hinkel's ruling of February

that the written statement would be received in evidence, he nonetheless waived any objection when the same evidence came in, both earlier and later, without objection.

The appellant asserts that the written statement injured him in three regards. He asserts that Maurice Williams's admission that the shootings "had something to do with insurance" implicated the appellant, for the obvious reason that the appellant was the beneficiary of the insurance policies on his wife's life. That same evidence, however, came into the case without objection during the testimony of Reginald Johnson that Maurice Williams had admitted to him that "he was involved" in the shootings and that "it was something to do with some insurance money." Indeed, in closing argument, appellant's counsel, in an effort to diminish the credibility of Mark Bowie, sought to exploit the widespread knowledge that insurance money was the motive for the attempted killing of Pamela Williams:

> [Y]ou heard Reginald Johnson's rumor that there was talk in the neighborhood, this TV and news. All this goes on for a three-year period. And *everybody who is privy to those rumors*, or whatever, *knows that there's insurance money.* They know it's $95,000. And I'll tell you how they know that. And they are talking about it. *This is not special information* that he knows at this point in time. *This is information that anybody that knew about this case had at their fingertips.*

(Emphasis supplied).

The other two regards in which the appellant claims he was injured by the written statement concerned Maurice Williams's declarations 1) that "his father would split the insurance money with him" and 2) that "his stepmother thought that he did it," the antecedent of the pronoun "he" arguably being the appellant. Even if the objection to Judge Hinkel's admissibility ruling of February 18 were arguably preserved, there was no objection—before, during, or after— when Detective Landsman read those portions of the written statement into the record on February 22.

When evidence is received without objection, a defendant may not complain about the same evidence coming in on another occasion even over a then timely objection. In *Jones v. State*, 310 Md. 569, 588–89, 530 A.2d 743 (1987), Chief Judge Murphy noted for the Court of Appeals:

> At trial, *Detective Ron Long testified over objection* that as a result of an initial interview with Mrs. Jordan "the suspect ... was identified as Gregory Jones." ... *Jones contends that the effect of Long's testimony was to introduce a hearsay statement, i.e.,* Mrs. Jordan's earlier statement that Jones was involved in the offenses....

> ... [W]e note that Long's testimony did not prejudice Jones because *Mrs. Jordan had testified earlier, without objection, that she named Jones as the perpetrator* of the shooting in her initial interview with Long. *Where competent evidence of a matter is received, no prejudice is sustained where other objected to evidence of the same matter is also received.*

(Emphasis supplied).

*Tichnell v. State*, 287 Md. 695, 715–16, 415 A.2d 830 (1980), spoke to the same effect, except that it phrased the issue foreclosure principle in terms of waiver rather than in terms of non-prejudice:

> Tichnell contends that the trial court improperly admitted evidence pertaining to crimes committed at the Friend residence....

> Tichnell objected to Friend's testimony on relevancy grounds....

> ...

> We think that *Tichnell waived his objection to the admission of the contested evidence. While he objected to Friend's testimony before it was given, and moved unsuccessfully for a mistrial after it was given, he did not thereafter object to the admission of his first statement to* the police, which recounted the crimes committed at the Friend home. *Nor did he object to the admission of his second statement,* which also contained details concerning

the commission of these offenses. Under Maryland Rule 522 d 2, *it is not reversible error when evidence, claimed to be inadmissible, is later admitted without objection.* . . . Thus, *even assuming the evidence of other crimes committed at the Friend residence was inadmissible, Tichnell nevertheless waived his objection to such evidence.*

(Citations and footnotes omitted; emphasis supplied).

*Robeson v. State,* 285 Md. 498, 507, 403 A.2d 1221 (1979), also dealt with the foreclosing effect on an objection to evidence when the same evidence also came in without objection:

After the allegedly objectionable question, the defendant testified in response to more questions by the State, without further objection by defense counsel . . . These *later questions in substance covered the same matter as the earlier question which was objected to.* The law in this State is settled that *where a witness later gives testimony, without objection, which is to the same effect as earlier testimony to which an objection was overruled, any error in the earlier ruling is harmless.*

(Emphasis in original; emphasis supplied).

One of the earliest Maryland decisions to establish this foreclosure principle was *Peisner v. State,* 236 Md. 137, 145, 202 A.2d 585 (1964):

Assuming *arguendo* that the appellant's objections were well taken, and that evidence was erroneously admitted, the question then becomes whether the error was rendered harmless . . .

*Over objection Mr. Docter was allowed to testify* that Symonds said that he, Symonds, Lifshutz and Peisner agreed to take money whenever it was available. *Thereafter he testified, without objection, that Peisner admitted the same thing.*

. . .

We conclude that evidence to the same effect as that given by Mr. Docter, which was objected to by the appellant, was clearly shown by other competent testimony, including that of the appellant himself, and that the error, if

any, in admitting Mr. Docter's testimony was thus rendered harmless.

(Emphasis supplied).

Although it would make no difference to our decision in this case, we note that this second-level form of non-preservation, whether conceptualized in terms of waiver or in terms of harmless error, would seem to be less vulnerable to a possible "plain error" exemption from the preservation requirement than would the more normal first-level form of non-preservation. We know of no case where the idea of "plain error" has ever been successfully invoked to overcome this type of appellate issue foreclosure.

## D. The Redaction Issue:

There is an incredible amount of static in this case emanating from the ultimate decision of the trial judge to have certain designated portions of Reginald Johnson's written statement to the police redacted before that statement was read to the jury by Detective Landsman.

Once again, we are constrained to note that several misleading statements in the appellant's brief and reply brief came dangerously close to giving this Court a wrong impression as to what actually happened at the trial. On page 30 of the appellant's brief it is stated that "the Detective read the jury the entire statement in its unredacted form." On page 31 the brief states, "For reasons not readily apparent, the Detective read the *entire* statement to the jury; none of the references to appellant had been redacted." (Emphasis in original). At pages 13–14 of the appellant's reply brief, it states, "Yet the following morning, when the Detective took the stand to read Reggie's statement, he read it in its unredacted form."

Relying on the appellate briefs and oral argument, this Court came away from argument with the initial impression that there had been an utter and total failure on the part of Detective Landsman to comply with the redaction ordered by the court. Only a line-by-line comparison of the Detective's testimony with State's Exhibit 10 subsequently revealed to us

that such was not the case. There were at least three and possibly five sets of questions and answers that were subject to redaction. The three sets unequivocally ordered to be redacted were, indeed, actually redacted. The two others were not.

Some confusion apparently arose from the fact that the decision to redact was the subject of discussion by court and counsel on two separate occasions, the first on the afternoon of February 18 and the second on the morning of February 22. A reading of the transcript of February 18 leads to the reasonable conclusion that two sets of questions and answers were going to be redacted as a result of that discussion. In the course of the subsequent discussion of redaction on the morning of February 22, three additional and consecutive sets of questions and answers were precisely identified for redaction.

The Assistant State's Attorney, who was in turn to pass on directions to Detective Landsman before Landsman testified, seems to have focused on the three sets of questions and answers which were precisely identified on February 22 but to have neglected to deal with the other two sets of questions and answers that seemed to have been marked for redaction on February 18.

For purposes of our present analysis, it is necessary to subject the five-page statement to close scrutiny. The first two pages simply identified Reginald Johnson and set the stage for the more significant discussion that was to follow. The last three pages contain twelve sets of questions and answers, four or five of which have substantive significance.

On the afternoon of February 18, it was the *sua sponte* decision of Judge Hinkel that some redaction seemed to be called for. Neither counsel for the appellant nor counsel for the codefendant ever initially suggested that redaction was desired. Judge Hinkel's decision, moreover, was unquestionably concerned with the basic Rule Against Hearsay. Reginald Johnson had no first-hand knowledge about this case. His answers to the police questions were all based on informa-

tion from more remote hearsay declarants. Most of those answers concerned the admissions made by Maurice Williams and, as admissions by a party opponent, basically satisfied the Hearsay Rule. In a quick surface analysis of Reginald Johnson's statement, they posed no apparent problem.

A closer reading of the statement, however, revealed that two of Reginald Johnson's answers dealt with hearsay declarants other than Maurice Williams. One of those hearsay declarants was James Howard. The second and more anonymous hearsay source was "a lot of rumors back then." It was these later two hearsay declarations that caught Judge Hinkel's eye and caused him, *sua sponte,* to be concerned about the basic hearsay problem and to bring up the subject of redaction:

> The Court: Counsel, obviously I think I should have read this statement before I allowed it to come in. *There are two sections in it that probably shouldn't come in* under the rules governing refreshing recollection and then allowing it to come in under those two statements concerning the rumors.
>
> *There is no mention in testimony concerning the* second *rumor about*—that is about Mr. *Donald Williams,* so the jury hadn't heard anything about that. But *that needs to be redacted* from this statement. *With respect to the first statement . . . I believe that was* brought out on cross examination, if I'm not mistaken, *about James Howard.*

(Emphasis supplied).

Of the twelve sets of questions and answers that comprised the substantive part of the written interview, it was the first set and the eleventh set that provoked the discussion of February 18. It was Reginald Johnson's first answer that passed on hearsay information from James Howard. That particular question-and-answer set, beginning at the bottom of page 2 of the statement and continuing to the top of page 3, consisted of the following:

> Q: Did there come a time when you suspected that Maurice was responsible for the murder?

A: Yes, a year or two after the murder, James Howard . . . who lived on Royce Ave., told me that Maurice said that he killed Tiffany.

That answer did not implicate the appellant in any way, but it did implicate Maurice Williams. Judge Hinkel indicated that if counsel requested, he would order that question and answer redacted from the statement and would, moreover, instruct the jury to disregard earlier testimony from Reginald Johnson about having heard the rumor from James Howard. Because counsel for Maurice Williams, however, had made the tactical decision somehow to exploit James Howard as a source of rumors, he declined to ask for such an instruction and further indicated that he did not want that question and answer redacted from the written statement:

Mr. Brown [Counsel for Maurice Williams]: No, Judge, I wouldn't ask for that instruction. Not at all.

The Court: You want the statement redacted?

Mr. Brown: That reference.

The Court: Two hearsay references?

Mr. Brown: They will have to speak for Donald Williams.

The Court: First one has to do with James Howard.

Mr. Brown: I do not want a redaction for that.

Mr. Stange [Counsel for appellant]: We do want it for Donald Williams, Your Honor.

Discussion then turned to the second clearly inadmissible hearsay declaration. It was the eleventh question-and-answer set. It appeared on page 5 of the statement and implicated the appellant. It consisted of the following:

Q: Does anything else come to mind that you can remember about this incident?

A: There were a lot of rumors back then that his father had something to do with it. Also that Maurice said his stepmother thought that he did it.

The discussion with respect to that exchange was as follows:

The Court: Let's make sure we get it redacted tomorrow. It is on page five.

. . .

The Court: ... Let me put it in the record what needs to be redacted. Do you have a copy of this, Mr. Stange?

Mr. Stange: Excuse me, Your Honor.

The Court: The part that needs to be redacted, let's make sure this is—what you are saying is, Mr. Stange—

Mr. Stange: I believe it's page five.

The Court: Page five. And the question is, "Does anything else come to mind that you can remember about this incident?" Answer, "There were a lot of rumors back then that his father had something to do with it. Also that Maurice said that his stepmother thought that he did it." That part if you desire, that would be redacted.

Mr. Stange: Yes, sir.

That concluded all discussion of redaction on February 18 and the court was then adjourned for the day.

When the court reconvened on the morning of February 22, it was Judge Hinkel who raised again the subject of redaction. His concern at that time was the modality for getting the written statement into evidence. He suggested that the jury not be handed a physical copy of the statement but that the redacted version of the statement be read to the jury, either by an Assistant State's Attorney or by a witness. At the State's suggestion, it was decided that the statement would be read into evidence by Detective Landsman, who had taken it. Counsel for the appellant at that time indicated total agreement with the proposed method of proceeding:

The Court: Mr. Stange [Counsel for appellant], do you have any comment.

Mr. Stange: We don't believe that it was Detective Landsman that took that interview.

The Court: He's signed as a witness on it.

Mr. Stange: Oh, has he?

The Court: And Detective West, both have, Landsman and West.

Mr. Stange: I guess as long as he testified that he was there at the time.

The Court: And it makes little difference to me and I don't think it makes much difference how you have it come in, whether the detective does it or the State reads it. I don't have any problem that way.

Mr. Stange: I agree.

Judge Hinkel then turned his inquiry to counsel for Maurice Williams, by way of seeking to reconfirm February 18's decision as to how question-and-answer set No. 1 would be handled. The judge's concern still seemed to be hearsay evidence against a particular defendant that did not qualify as a hearsay exception:

It's your intention not to include that part of the statement that relates to your client which is hearsay? Now, you didn't want it redacted the other day nor did you want me to instruct the Jury. I'm going to instruct the State not to read that and if you want to put it in, then you may put it in.

Mr. Brown [Counsel for Maurice Williams]: That's fine.

The Court: So we're straight on that. Beginning on the top of page—

Mr. Stange:—3.

Mr. Brown:—3, I think it is, actually it goes over from the bottom of 2.

The Court: Bottom of page 2, the question at the bottom, the answer on top of page 3, *and the next question and answer on page 3, that needs to come out.*

(Emphasis supplied).

The reference to "the next question and answer on page 3" seemed to include for the first time question-and-answer set No. 2 in the proposed handling of question-and-answer set No. 1. That additional material was clearly peripheral to question-and-answer set No. 1 and would have made no sense without reference to it:

Q: When you heard this from Jimmy Howard, what year was this?

A: 1991 or 1992.

Almost immediately, the court revisited the issue of whether to redact question-and-answer set No. 1 (and along with it question-and-answer set No. 2). Because the answer only affected Maurice Williams, the decision was left to him:

The Court: ... [I]f Mr. Brown wants to put it in, he needs to say so. Otherwise it stays out.

Counsel for Maurice Williams then explained to the court how he wished to use references to James Howard in closing argument. In response to that, the resolution of the issue seems to have been that those two sets of questions and answers would not be redacted:

The Court: ... The point is, I want to know whether you want that portion which I'm prepared to keep out—whether you want that read in. That's the area that—where he talked to James Howard, where Mr. Johnson says he got information from James Howard.

Mr. Brown: Yes, I would want it in.

The Court: You want it in?

Mr. Brown: Yes.

In any event, none of that material affected the appellant. It made no difference to his fortunes whether those particular sets of questions and answers came in or not.

At that point, there had been no revisiting of February 18's decision to redact question-and-answer set No. 11, which did affect the appellant. It clearly appears that Judge Hinkel then took up again that February 18 decision with respect to question-and-answer set No. 11 as he turned to counsel for the appellant and referred specifically to *"that one ... part that we were going to redact before."* That reference was indisputably to the decision of February 18 as to the clearly inadmissible hearsay, the source of which had been "a lot of rumors back then." It equally clearly was the intention of Judge Hinkel not to suggest additional redactions but to confirm the

two redactions, one affecting each of the codefendants, that had already been agreed upon on February 18:

> The Court: And, Mr. Stange, you are of the same mind, that you do not want anything in about your client, Donald, right?
>
> Mr. Stange: That's correct.
>
> The Court: So that portion that refers to—*that one*-page four-*part that we were going to redact before,* first question and answer—

(Emphasis supplied). Although the language, out of context, was broad when it referred to not wanting "anything in about your client," the context in which the court was directing the inquiry of both defense attorneys was that of the blatantly inadmissible hearsay declarations discussed on February 18, emanating from James Howard and from "a lot of rumors back then," respectively.

The problem was that in referring to "that portion . . . that we were going to redact before," Judge Hinkel erroneously referred not to page 5 of the statement, which contained that portion, but to page 4. As the State then sought to clarify precisely what was to be redacted from the written statement, the initial error was compounded. As a result, question-and-answer sets 5, 6, and 7, all of which were on page 4, appear to have been added, by accident, to the redaction order:

> Mr. Norman: Starting with "Did he say . . .," Your Honor? Is that what you mean?
>
> The Court: Right, "Did he say that his father . . ." And the next question and answer after that, and then the next question and answer after that.

The three sets of questions and answers that were thereby added to the redaction order, seemingly by accident, were:

> Q: Did he say that his father Donald Williams knew about the murder?
>
> A: He never really said that his father knew he did it.
>
> Q: How long did you talk about it?
>
> A: Just a few minutes. I had my doubts about it.

Q: Did he say what the insurance was on?

A: His stepmother—Pamela Williams.

Conversely, it appears that in this process question-and-answer set No. 11 was, by the same accident, omitted from the redaction order. Before the discussion was concluded, however, the Assistant State's Attorney sought to pinpoint with precision exactly what material was being redacted from the statement:

Mr. Norman: ... [S]o I'm clear, Your Honor, in terms of reading, we would go from the end of the first paragraph where the last word is "him"—

The Court: Right.

Mr. Norman:—all the way down to the bottom of the page where the next question would be, "What was his demeanor?"—meaning Maurice's, I believe—would come in?

The Court: Yes.

Mr. Norman: Very well.

The Court: So that takes out everything that refers to Defendant Donald [Williams]. Okay?

Mr. Norman: Yes, sir.

Throughout all of this process, counsel for the appellant said nothing. There were no objections. There were no further redactions sought. There were no clarifications sought. Counsel seemed to be acquiescent with whatever the court decided to do.

At that point, all discussion with respect to the subject of redaction was concluded. Several State's witnesses, not pertinent to the redaction issue, were called to the stand and testified. Detective Landsman then took the stand and testified in several different regards. As the direct examination reached the point where he was to read into evidence his question-and-answer interview with Reginald Johnson, there were no preliminary admonitions or precautionary measures suggested by anyone. The detective simply proceeded to read the five-page statement. He redacted from his reading question-and-answer sets 5, 6, and 7, all contained on page 4 of the

statement, as the court clearly had directed to be done. He did not redact, however, question-and-answer set No. 11, from page 5.

After Detective Landsman finished reading the statement, he went on to testify about other matters. No objection was made by anyone. Throughout the rest of the trial, no mention was made of his having failed to redact question-and-answer set No. 11. At the hearing on the appellant's motion for a new trial, there was no reference made to his having failed to redact question-and-answer set No. 11.

### E. Reducing the Alleged Redaction Violation by Two-Thirds:

Before we even take up the appellant's failure to preserve, by timely objection, any challenge to Detective Landsman's reading of the statement from Reginald Johnson, we must reduce to appropriate size the appellant's claim of prejudice. He now asserts that he was damaged in three regards by the failure of Detective Landsman to comply with the redaction order. 1) He objects to Reginald Johnson's mention, in the statement, that Maurice Williams had said that the shootings "had something to do with insurance." 2) He objects to Maurice Williams's declaration that "his father would split the insurance money with him." 3) He finally objects to Maurice Williams's declaration that "his stepmother thought that he did it."

Only the third of those statements, however, came into evidence in apparent violation of the redaction order. The first two statements were made in the course of question-and-answer set No. 4, which was indisputably not covered by the redaction order and which had never even been the subject of a requested redaction. That question and answer, in evidence without objection, was:

Q: Did there come a time when he told you who did it?

A: Yes, about 1993 or 1994. We were on my front porch at 4001 Groveland Ave. I asked if they found out who did it. We were drinking. *He told me that he did it*

*and I said why and he said insurance money.* Then I asked why did he shoot Tiffany because I didn't believe him. He said he shot Tiffany because she knew too much. I asked how did you get out there and he told me Mark Bowie took him out there. I asked him how ·much money and I remember him telling me a figure that seemed too small to kill possibly two people for. *He said that his father would split the insurance money with him.*

(Emphasis supplied).

Also read into evidence without objection and without having been the subject of any redaction order was question-and-answer set No. 8:

Q: What was his demeanor?

A: He was mad at his father, like he did this all for nothing.

The fact that the declarations of Maurice Williams 1) that he had involved himself in the shootings for the "insurance money" and 2) that "his father would split the insurance money with him" were in evidence without objection significantly diminishes any claim of prejudice by the appellant with respect to Maurice Williams's declaration that "his stepmother thought that he did it." *Jones v. State,* 310 Md. at 588–89, 530 A.2d 743; *Tichnell v. State,* 287 Md. at 715–16, 415 A.2d 830; *Robeson v. State,* 285 Md. at 507, 403 A.2d 1221; *Peisner v. State,* 236 Md. at 145, 202 A.2d 585. Quite aside from that evidence, there was the testimony of Reginald Johnson, also received without objection, that the shootings "had involved insurance money."

## F. Who Decides Whether An Error is Incurable?

 Our dispositive response to the appellant's contention that the redaction order was erroneously violated is that the appellant never objected when the statement was read into evidence and the claim, therefore, is unpreserved for appellate review. The appellant's parry to the thrust of non-preservation is that even if he had objected, the error could not have

been cured. He argues from that that he should be forgiven the failure to make a pointless objection to an incurable error.

Quite aside from the fact that such an exemption from the preservation requirement is not the Maryland law, the appellant's argument is badly flawed—both legally and factually. Legally, the appellant's premise that the error was, in fact, incurable relies on a series of quotations from *Bruton v. United States,* used in that opinion to support the proposition that a mere curative instruction can never erase from a juror's mind the accusation in the confession of a non-testifying codefendant that the defendant participated along with the codefendant in the commission of the crime. *Bruton,* of course, was establishing the broad constitutional principle that curative instructions should not be relied upon to legitimate the admission of the confession of a non-testifying defendant at a joint trial, if in the course of that confession the confessor asserts that the codefendant also participated in the crime.

In this case, of course, we are not dealing with a *Bruton*-like assertion by the codefendant that the appellant actually participated in the crime. We are not dealing with the circumstance described by *Bruton* as one where "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." 391 U.S. at 135–36, 88 S.Ct. 1620. We are dealing, rather, with a statement by the codefendant that the codefendant's "stepmother thought that [the appellant] did it." It is not even passing on the knowledge of or an observation by the stepmother but only her belief or suspicion.

It is not to countenance the failure to redact that answer to point out that it is by no means a foregone conclusion that a strongly worded curative instruction might not have sufficed to detoxify such a lone and passing reference to the crime victim's suspicion. *See Guesfeird v. State,* 300 Md. 653, 659, 480 A.2d 800 (1984)("In determining whether evidence of a lie detector test was so prejudicial that it denied the defendant a fair trial, courts have looked at many factors. The factors

that have been considered include: whether the reference to a lie detector was repeated or whether it was a single, isolated statement."); *Braxton v. State,* 123 Md.App. 599, 666–68, 720 A.2d 27 (1998).

The reference was, to be sure, hearsay and it should not have come in, but it was not necessarily of the lethal virulence of the *Bruton* confession, and that is our only point at this juncture. The trial judge at least should have been permitted to consider and to discuss with counsel the feasibility of various possible sanctions. *See Klauenberg v. State,* 355 Md. 528, 555–56, 735 A.2d 1061 (1999); *Hunt v. State,* 321 Md. 387, 422, 583 A.2d 218 (1990); *Burks v. State,* 96 Md.App. 173, 188–90, 624 A.2d 1257 (1993); *Brooks v. State,* 85 Md.App. 355, 360, 584 A.2d 82 (1991). As Judge Bloom pointed out for this Court in *Brooks v. State,* 68 Md.App. 604, 613, 515 A.2d 225 (1986), citing *Bruton v. United States:*

> While a defendant is entitled to a fair trial, he is not entitled to a perfect one; and *when curative instructions are given, it is presumed that the jury can and will follow them. Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968).

(Emphasis supplied).

Our point is not that there were necessarily alternative sanctions. That issue is not before us. Our point, rather, is that the appellant was not entitled, as a forgiveness of the preservation requirement, to arrogate unto himself that determination and to assume unilaterally that there were no alternative sanctions. He was required to make timely objection to whatever he thought was error.

### G. Does the Preservation Requirement Also Apply to Incurable Errors?

In yet a second regard the appellant's argument that there was no point in objecting to an incurable error and that the preservation requirement was, therefore, waived is legally flawed. If in the course of a trial an error occurs which is, *arguendo,* indisputably incurable, an objection is still called for

so that the court and counsel may explore the necessity for, *inter alia,* an immediate mistrial. In this case, for instance, the redaction error in question occurred in the course of the State's case. There may have been other State's witnesses yet to be called. There would have been argument on motions at the end of the State's case. There might have been extensive cases for the defense to be put on by each of two differently situated codefendants and involving numerous defense witnesses. There might have followed a State's case in rebuttal. There would follow more argument on motions, instructions to the jury, closing arguments by counsel, jury deliberations, a sentencing hearing, and a possible hearing on a motion for a new trial. If the granting of a timely motion for a mistrial were a certainty because an incurable error had occurred, it would be unforgivable simply to sit back and to condemn the court to wasted hours and wasted days in an exercise in utter futility.

Even if defense counsel is sure that irredeemable error has occurred, he is required, at the peril of non-preservation, to bring it to the immediate attention of the court. The sin to be avoided is that of the defense's sitting back and waiting to see what the verdict is going to be before deciding whether to play its "trump" card. Saving precious judicial resources from needless waste is more important than giving a defendant "two bites out of the apple." Even in the face of incurable error, there is no forgiveness of the responsibility to make timely objection.

### H. Was There Time to Object?

 The appellant's argument that "the cat was already out of the bag," irretrievably, before he had an opportunity to object is also badly flawed factually. Vigilant counsel should have been alerted to a possible redaction problem as soon as Detective Landsman read the first set of questions and answers from the bottom of page 2 and the top of page 3. Although the exchange between court and counsel on February 22 could be read as a decision that that particular material was not to be redacted, the earlier colloquy of February 18

had clearly pointed toward redaction. When Detective Landsman in his testimony failed to redact that question and answer, therefore, all hands should have been, at the very least, at battle stations as he proceeded with his reading. Questions-and-answer set No. 11, now in issue, was still three pages ahead when that first alarm was sounded and should have been heeded.

Even in the tighter context of question-and-answer set No. 11 itself, the unoffending question, "Does anything else come to mind that you remember about this incident?" was read by Detective Landsman before he began to read the answer. To anyone paying a modicum of attention, it was immediately obvious that the redaction train was off the tracks. *See Bruce v. State,* 328 Md. 594, 628–29, 616 A.2d 392 (1992) ("We believe that Bruce's counsel should have been able to anticipate the type of answer called for by the question and thus should have been able to perceive grounds for an objection as soon as the question was asked—before the answer."). The present assertion that the damage was done before the appellant had the chance to object, therefore, simply does not hold water. The appellant had the chance to object but did not do so.

## I. The Real Reason for Not Objecting:

In yet a final respect, the appellant's argument as to why he should be forgiven his failure to object is factually flawed. He now contends that he refrained from objecting to the non-redaction because an objection would have been useless in terms of curing the error. That was obviously not the actual reason for the non-objection, as the appellant himself revealed at the hearing on his motion for a new trial. The real reason the appellant did not object to the redaction violation is because appellant's counsel did not realize, even at that late hour, that a redaction violation had occurred. Appellant's counsel was not aware of precisely which questions and answers were subject to redaction and which were not. Appellant's counsel conceded that more redaction should have been requested than had been requested and that the fault was in part his own. As appellant's counsel candidly acknowledged at that hearing:

*I'm not sure . . . what you were redacting* at that point on time, whether it was things that referred to Donald Williams, whether [it was things] we believe would be hearsay within hearsay or whether it was things such as a witness talk[ing] about he heard rumors.

*I'm not sure what was to be redacted* at that point in time. *We redacted only a small amount of the statement,* but *we did not redact certain references to Donald Williams such as things about insurance and Donald Williams himself* other than one thing that seemed to be redacted as that was it was asked did Maurice say whether his father knew about this incident? No. He didn't say he knew about it.

Oddly enough, that which is somewhat exculpatory, that was redacted for whatever reason. *I believe that all of us,* maybe not the State's attorney, but I think both counsel on our side—I'm not sure about the Court—*may have been in a little confusion as to what we are going to do here.*

(Emphasis supplied).

For all of these reasons, this *post hoc* argument by the appellant 1) that he had no opportunity to object before the error occurred and 2) that he refrained from objecting thereafter because the objection could have accomplished nothing is completely untenable.

## The "Grab Bag" Contention

The final contention is a blanket adoption of all of the contentions raised by the codefendant. The entire contention, with full supporting argument, states simply:

APPELLANT ADOPTS THE ARGUMENTS ADVANCED IN THE BRIEF FILED BY MAURICE WILLIAMS (#381) [Md. Court Rule 803–5(f) ] [2]

Our response is going to be almost as cryptic as the contention. One of the codefendant's contentions demonstra-

---

**2.** We assume the reference to Maryland Court Rule 803–5(f) [sic] was intended to be a reference to Maryland Rule 8–503(f), which provides:

bly does not even apply to the appellant. With respect to three of them, the appellant never made an objection. With respect to the fourth, we are not persuaded on the merits.

We will not further sort through and organize for the appellant a contention or a set of sub-contentions he fails to put together for himself.

### Postlude

Our affirmance of the convictions in this case is by no means with prejudice to the appellant's entitlement to seek further relief by way of post-conviction review. He may in that forum have grievances to pursue; that is not for us to say. The field does seem to have been strewn with abandoned weapons. There may, on the other hand, have been sound tactical reasons for refraining from possible objections, but that is something that can only be explored in an evidentiary hearing focusing on that question.

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.*

---

**Incorporation by reference.** In a case involving more than one appellant or appellee, any appellant or appellee may adopt by reference any part of the brief of another.