755 A.2d 560

Thomas Dalton DIXON

v.

STATE of Maryland.

No. 1211, Sept. Term, 1999.

Court of Special Appeals of Maryland.

July 13, 2000.

326

Richard K. Jacobsen, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Jack Johnson, State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Submitted before MOYLAN, KRAUSER and JAMES S. GETTY (Ret., Specially Assigned), JJ.

MOYLAN, Judge.

The appellant, Thomas Dalton Dixon, was convicted by a Prince George's County jury, presided over by Judge G.R. Hovey Johnson, of first-degree assault and the use of a handgun in the commission of a crime of violence. He was sentenced to twenty years imprisonment for the first-degree assault and a consecutive sentence of twenty years for the handgun violation. On this appeal, he claims

1) that Judge Johnson erroneously permitted the victim to testify that he had on a prior occasion purchased drugs from the appellant;

2) that Judge Johnson erroneously admitted evidence showing that the appellant shot and hit a second person;

3) that the twenty-year sentence for first-degree assault was illegal; and

4) that Judge Johnson erroneously allowed the prosecutor to *nol pros* the charge of attempted voluntary manslaughter and erroneously failed to instruct the jury with respect to that count.

### What Do We Look At:
### The Forest or the Trees?

Our discussion of the first two contentions will interweave with our description of the factual background of the case.

Both of those contentions assert that there was a violation of the law prohibiting the admission against a defendant of evidence showing the commission by him of "other crimes." In holding that no such error was committed, our fundamental rejection of the appellant's argument stems from the fact that he is looking at a legal principle in microcosm and fails to appreciate the larger view of what that principle is designed to accomplish.

The ultimate end to be served by the ban on "other crimes" evidence is that the State should not be permitted to bring in "out of left field" the fact that on some other occasion the defendant committed a crime. The danger being guarded against is that such past behavior will be offered to show and will be used by a jury to conclude that the defendant has a propensity to commit crime. The fear is that the jury may convict him in the case on trial because of something other than what he did in that case, to wit, because of his criminal propensity. There are also some well recognized exceptions to the evidentiary ban, permitting the evidence of "other crimes" to come in, if it is important to show something other than criminal propensity, such as identity, intent, motive, common scheme, etc. Md. Rule 5–404(b). An extensive body of law has evolved analyzing both the "other crimes" evidentiary prohibition and the various exceptions thereto. *Harris v. State,* 324 Md. 490, 597 A.2d 956 (1991); *State v. Faulkner,* 314 Md. 630, 552 A.2d 896 (1989); *Bussie v. State,* 115 Md.App. 324, 330–38, 693 A.2d 49 (1997); *Wieland v. State,* 101 Md.App. 1, 8–23, 643 A.2d 446 (1994); *Solomon v. State,* 101 Md.App. 331, 337–47, 646 A.2d 1064 (1994).

At the most fundamental level, however, we conclude that that entire body of law has no bearing on this case. There will be found in the extensive case law, to be sure, isolated phrases and sentences that, when lifted out of context, might seem to support the appellant in his present contentions. We decline to haggle, however, over such minutiae because of our view, in longer perspective, that that body of law is inapplica-

ble. Why anguish over whether the appellant is in the right pew when we conclude that he is not even in the right church?

Although the direct evidence of what happens at a crime scene may sometimes show some possible crime in addition to the one literally charged, that coincidental possibility does not necessarily engage the gears of "other crimes" evidence law. What we have in this case is evidence essentially integral to, even if not literally inextricable from, the criminal incident on trial. In earlier decades, it would have been felicitously referred to as part of the *res gestae* of the crime.

### The Criminal Incident

The crime in this case took place during the early morning hours of. May 23, 1997. The assault victim was Edward Johnson. Earlier that morning, he and a friend, Paquita Waiters, had together smoked between $40 and $50 of crack cocaine. Exhausting their supply by approximately 2 A.M., the two of them drove to the intersection of Virginia Avenue and Forest Terrace in Prince George's County to buy some more. During the State's case in chief, three witnesses testified as to what happened when Johnson and Waiters arrived at Virginia Avenue and Forest Terrace.

Johnson himself testified that he got out of his car, walked up to a group of men including the appellant, and told the appellant that he wanted to buy some crack cocaine. At that point, the appellant "like turned around, and then I thought he was pulling out some drugs, you know, and then he turned around and had a gun." Johnson went on to state that "at first I was shocked and then after I went and hit him, I ran ... straight down Virginia, right past my car and kept going." Johnson testified that he heard gunshots and then was struck in his back and buttocks and "it broke my leg in some kind of way." Johnson denied having had a gun or having pulled a gun on the appellant at any time during the incident.

The appellant's first contention concerns Johnson's explanation of why he stopped the car and approached the appellant in the first instance and of how he was able to

identify the appellant first at the scene and subsequently in court. Over a defense objection, the direct examination went as follows:

Q: Did you know the individual whom you approached:

A: I have seen him before.

Q: Had you dealt with him before?

A: Yes.

Q: Had you purchased drugs from that individual before?

A: Yes.

Although we could validate that testimony on the theory that it undergirds Edward Johnson's ability to make a reliable identification of the appellant as the criminal agent,[1] *Harris v. State*, 324 Md. at 501, 597 A.2d 956, *State v. Faulkner*, 314 Md. at 634, 552 A.2d 896, that would be to dignify the contention more than it deserves to be dignified. Fundamentally, this was simply not extrinsic evidence showing the appellant's criminal propensity. It was direct evidence as to why Johnson stopped the car and approached the appellant in the first instance. In view of the fact, moreover, that the entire confrontation was one between a would-be purchaser of drugs and an ostensible seller of drugs, the coincidental fact that the two had been involved on an earlier occasion or occasions was inconsequential in terms of prejudicial impact. But for Johnson's knowledge that the appellant was someone from whom he could purchase "more crack," his entire narration of the incident that morning would have been unintelligibly bizarre. We see no error.[2]

---

**1.** After Johnson testified that he had selected a photograph of the appellant from a photographic array presented to him while he was being treated at the Shock Trauma Unit, defense counsel vigorously cross-examined him about the effects of his pain medication in an effort to show that he, under the influence of morphine, was not "aware of what he was doing" when he made that identification.

**2.** Just as a precaution, it is worth noting that at a later point in the direct examination of Johnson, the following came in without objection:

It was Paquita Waiters who had earlier that evening smoked crack cocaine with Edward Johnson and who accompanied him to the crime scene to buy more crack cocaine. Her version of the *corpus delicti* essentially paralleled the version given by Edward Johnson. She testified that when Johnson stopped the car at Virginia Avenue and Forest Terrace, he asked a group of men standing there if any of them had any drugs for sale. He then got out of his car. Although she could not identify the assailant, she described how one of the men approached Johnson and "was trying to get the money from [him] without giving him the purchase." One of the men then struck Johnson on the head with an object that looked like a gun. Both she and Johnson then ran down Virginia Avenue. Paquita Waiters heard gunshots and saw Johnson fall to the ground. She hid in the bushes for a few minutes and then ran to a 7–11 store and asked someone there to call the police.

The third witness to testify for the State in chief was one of the appellant's companions that morning. Carnell Chase testified that he and the appellant were at the corner of Virginia Avenue and Forest Terrace at about 2:30 A.M. when a car containing a man and a woman pulled up. The driver, the man, asked "if they had any cocaine." It was the appellant who responded. He told the driver of the car to wait and the driver got out of the car. The appellant walked over to some bushes, retrieved a .22 caliber revolver, and returned to the car. The appellant then told the driver to "give his money up." The driver turned his money over to the appellant but then "tried to fight [the appellant] off."

---

[Prosecutor]: You indicated previously you had purchased drugs from the Defendant in that area? Do you know approximately how many times?

[Johnson]: No, not really.

*See Klauenberg v. State,* 355 Md. 528, 541, 735 A.2d 1061 (1999); *Jones v. State,* 310 Md. 569, 588–89, 530 A.2d 743 (1987); *Tichnell v. State,* 287 Md. 695, 716, 415 A.2d 830 (1980); *Williams v. State,* 131 Md.App. 1, 22, 748 A.2d 1 (2000); and *Clark v. State,* 97 Md.App. 381, 394–95, 629 A.2d 1322 (1993).

As Chase moved closer "to see what was going on," the driver took a swing at him. Chase swung back at the driver and hit him. The driver told his female passenger to run, removed his keys from the car's ignition, and then himself ran up the street. Chase described how the appellant then fired "about 5 or 6" shots at the driver. Chase did not see the driver with a gun at any time.

■ The appellant's second contention concerns Chase's testimony as to what happened as the appellant fired five or six shots at the fleeing driver. His description included the following observation:

*I seen Mike fall on the ground,* and then I seen the male that was driving the car still running, and then after that, he had got hit ... I saw the blood and stuff.

(Emphasis supplied).

"Mike" was the third individual who was with the appellant and Carnell Chase at the time of the incident. After Carnell Chase described seeing "Mike fall on the ground," the State inquired as to the identity of Mike. Over objection, the following testimony came out:

Q: You mentioned Mike. Who was Mike?

A: He's a crack head.

Q: And, do you know what happened to Mike?

A: He got shot.

Again, we simply do not elevate this to the level of "other crimes" evidence establishing the appellant's criminal propensity. It is a layman's description of what happened as the appellant fired five or six shots at the fleeing Edward Johnson. It is no more significant than if one of those shots had smashed a flower pot or stilled a yelping dog. One witness may observe and describe a crime scene epigrammatically, *a la* Emily Dickinson. Another may observe and describe the same scene panoramically, *a la* Walt Whitman. The fact that a stray bullet winged "Mike" was simply part of the unfolding panorama. Could it have been excised? Of course! Does it make any difference that it was not? Of course not!

We might, of course, expatiate on "same transaction" relevance and cite *Bussie v. State,* 115 Md.App. at 333–38, 693 A.2d 49, *Solomon v. State,* 101 Md.App. at 354, 646 A.2d 1064, *Tichnell v. State,* 287 Md. 695, 712, 415 A.2d 830 (1980), and *Ross v. State,* 276 Md. 664, 670, 350 A.2d 680 (1976). It is pointless, however, to haul out heavy analytic equipment when instinct tells us clearly that the contention does not even break the horizon of possible significance.[3]

### *North Carolina v. Pearce*
### And Vindictive Resentencing

On a more serious note, the appellant invokes *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). In that case, the Supreme Court held that if 1) a judge imposes a sentence on a defendant for a particular crime, 2) the defendant successfully appeals and the case is remanded for a retrial, and 3) the defendant is again convicted of the same crime by the same judge, that judge may not impose a greater sentence on the second occasion unless he can give valid reasons for doing so. The Supreme Court was guarding against the risk of judicial vindictiveness, the punishing of a defendant for appealing a judge's decision. It sought to avoid the "chilling effect" that the fear of vindictiveness at a resentencing might have on a defendant's right to appeal his initial conviction.

---

3. Again just as a precaution, we note 1) that during a subsequent part of the State's case-in-chief, two different officers testified, without objection, to attending a second shooting "victim" found at the scene; 2) that on the cross-examination of the appellant, several references were elicited, without objection, to his accidental shooting of "Mike"; and 3) that in rebuttal, one of the officers testified, without objection, to references made by the appellant to the accidental shooting of "Mike." Although defense counsel had at one point requested a continuing objection to any reference to the shooting of "Mike," Judge Johnson did not grant a continuing objection. *See Klauenberg v. State,* 355 Md. 528, 541, 735 A.2d 1061 (1999); *Jones v. State,* 310 Md. 569, 588–89, 530 A.2d 743 (1987); *Tichnell v. State,* 287 Md. 695, 716, 415 A.2d 830 (1980); *Williams v. State,* 131 Md.App. 1, 22, 748 A.2d 1 (2000); and *Clark v. State,* 97 Md.App. 381, 394–95, 629 A.2d 1322 (1993).

The appellant simultaneously invokes Md.Code (1998 Repl. Vol.) Cts. & Jud. Proc. Art., § 12–702(b), which provides:

(b) *Remand for sentence or new trial; limitations on increases in sentences.*—If an appellate court remands a criminal case to a lower court in order that the lower court may pronounce the proper judgment or sentence, or conduct a new trial, and *if there is a conviction following this new trial, the lower court* may impose any sentence authorized by law to be imposed as punishment for the offense. However, it *may not impose a sentence more severe than the sentence previously imposed for the offense* unless:

(1) The reasons for the increased sentence affirmatively appear;

(2) The reasons are based upon additional objective information concerning identifiable conduct on the part of the defendant; and

(3) The factual data upon which the increased sentence is based appears as part of the record.

(Emphasis supplied). With respect to that section, *Davis v. State*, 312 Md. 172, 177, 539 A.2d 218 (1988), pointed out that "the Legislature intended to codify the ... holding of *North Carolina v. Pearce* ... that due process requires not only that vindictiveness play no part in the re-sentencing, but also that a defendant must be free of apprehension of such a retaliatory motivation."

■ For this criminal incident, the appellant was initially sentenced on December 12, 1997. He had been convicted on three counts, those charging 1) attempted voluntary manslaughter, 2) first-degree assault, and 3) the use of a handgun in the commission of a crime of violence. He was sentenced by Judge Thomas A. Rymer to twenty years imprisonment for the first-degree assault, to ten years of concurrent imprisonment for the attempted voluntary manslaughter, and to twenty years of consecutive imprisonment for the use of a handgun.

Those convictions were appealed to this Court. In an unreported opinion filed on October 30, 1998, we reversed all three convictions because the trial judge had erroneously

failed to make an adequate inquiry into a reported violation of the trial court's sequestration order. That was our only holding. The appellant had, however, raised four other contentions. By way of *dicta*, we did go on to "address each question presented for the Court's guidance on remand." One of those other contentions was that the trial court erred "by imposing separate sentences upon the convictions for first-degree assault and attempted manslaughter."

In our gratuitous discussion of that contention "for the Court's guidance on remand," we pointed out that from "our scrutiny of the record" in that case and from the jury instructions actually given in that case, we could not determine which prong of first-degree assault that jury had relied on to reach its verdict of guilty on that charge. Our discussion concluded by saying:

> We are faced with ambiguity regarding not only the jury's verdict and the trial court's instructions, but also with the legislature's intent. Under *Snowden*, we would be constrained to give appellant the benefit of the doubt and merge his sentence for first degree assault into the greater sentence of attempted voluntary manslaughter. As we have stated previously, "[t]he fundamental principle of fairness in meting out punishment," *Snowden [v. State]*, 321 Md. [612,] at 619, [583 A.2d 1056 (1991)], would require such a conclusion.

From the springboard of that *dicta*, the appellant now essays an extraordinary leap of logic. Although he raises thereby a subject our *dicta* never directly addressed, he argues that the merger of first-degree assault into attempted voluntary manslaughter alluded to by our opinion should compel a sentencing "cap" of ten years, the maximum penalty for attempted manslaughter, at the retrial where an attempted manslaughter count was never submitted to the jury.

In an H.G. Wells-like reversal of tenses, moreover, the appellant ignores the fact that the *dicta* was aimed at guiding a sentencing judge **in the future** 1) if there were a retrial and 2) if there were reconvictions on the same counts. In a

reversal of direction on the time line, the appellant rewrites history as he projects the arguable penalty "cap" **into the past** and somehow reforms Judge Rymer's December 12, 1997, sentences of twenty years for first-degree assault and ten years for attempted voluntary manslaughter into a single sentence of ten years for the two offenses combined. Among many other problems, he conveniently ignores that there were no past sentences still in need of being reformed because their underlying convictions had already been reversed.

To implicate *North Carolina v. Pearce* and § 12–702(b), the appellant's Orwellian revision of history produced the major premise on which he builds his syllogism:

> For purposes of § 12–702(b), therefore, *the sentence that was imposed* for "the offense" of attempted voluntary manslaughter/first degree assault *was ten years.*

(Emphasis supplied).

That premise, of course, is not true. Ten years was not the sentence Judge Rymer imposed. Section 12–702(b) speaks of "the sentence previously imposed for the offense." *North Carolina v. Pearce* constantly refers to the sentence "originally imposed." For purposes of both the Maryland Rule and the federal Due Process Clause, it is beyond dispute that the standard against which we measure any subsequent sentence is the original sentence that actually **WAS**, not the sentence that arguably **SHOULD HAVE BEEN**.

The "sentence previously imposed" is the sentence that first came from the mouth of the sentencing judge—right or wrong, lawful or unlawful, constitutional or unconstitutional— and not the subsequent fate of that sentence, as it may have been cut or trimmed or shaped or in any way reformed by *ex post facto* appellate analysis. When Judge Rymer pronounced his sentences on December 12, 1997, that sentencing event was, for purposes of *North Carolina v. Pearce* and Md. Rule 12–702(b), locked immutably into history. No *dicta* of ours can change what Judge Rymer did. We may alter the effect of what he did, but we cannot change the fact that he did it. Neither may a leap of logic by the appellant. "The moving finger writes and, having writ, moves on . . ."

The twenty-year consecutive sentences, imposed both then and now, for the unlawful use of a handgun do not concern us. The ten-year sentence originally imposed for attempted manslaughter does not concern us, for there was no attempted manslaughter conviction at the retrial now under review. Our only concern is with the twenty-year sentence imposed by Judge Johnson for first-degree assault. The original sentence imposed by Judge Rymer for first-degree assault was precisely the same, twenty years. There has been, therefore, no increase in sentence within the contemplation of *North Carolina v. Pearce* or § 12–702(b).

### An Alternative Theory
### For a Sentencing "Cap"

In a separate subcontention, the appellant poses a completely distinct theory as to why the twenty-year sentence for first-degree assault was arguably improper. He invokes *Simms v. State,* 288 Md. 712, 421 A.2d 957 (1980), *Gerald v. State,* 299 Md. 138, 472 A.2d 977 (1984), and *Johnson v. State,* 310 Md. 681, 531 A.2d 675 (1987), for the proposition that, notwithstanding the eleventh-hour *nol pros,* the erstwhile presence in the trial of the attempted manslaughter count, after jeopardy had attached, effectively established a ten-year sentencing "cap" that precluded any greater sentence being imposed for the first-degree assault charge.

Whereas the earlier subcontention, involving the risk of vindictive resentencing, can only be triggered by the sequence of 1) an original conviction and sentence, 2) an appellate reversal followed by a retrial, and 3) a reconviction and resentencing, this second subcontention is unconcerned with any trial sequence. The appellant's argument would be precisely the same if there had never been an earlier trial. Even in the limited, present-tense context of a single trial, however, the appellant's argument does rely on the *dicta* from our opinion reviewing the first trial.

For purposes of the discussion that follows, we may conveniently put to one side the fact that the appellant was charged

with and convicted of the use of a handgun in the commission of a crime of violence. There is no challenge being made with respect to that. What is here pertinent is that the appellant was charged with 1) attempted voluntary manslaughter, a crime carrying a maximum penalty of ten years, and 2) first-degree assault, a crime carrying a maximum penalty of twenty-five years. The State, over the appellant's objection, *nol prossed* the attempted manslaughter charge at the close of all of the evidence. The appellant was convicted of first-degree assault and sentenced to twenty years imprisonment for it.

The unusual twist that gave rise to the *Simms, Gerald,* and *Johnson* cases, of course, was that the common law misdemeanor of simple assault, prior to a codification of assault law in 1996, had no statutorily prescribed penalty. The choice of a common law penalty was in the unfettered discretion of the trial judge, provided only that it not be cruel or unusual within the contemplation of that constitutional prohibition. *Walker v. State,* 53 Md.App. 171, 193–99, 452 A.2d 1234 (1982). It was, therefore, the ironic case that the penalty for simple assault could be far greater than the maximum penalty for a variety of aggravated and felonious assaults. As the Maryland case law evolved, *Simms, Gerald,* and *Johnson* imposed a necessary sentencing "cap" on simple assault under certain clearly defined and compelling circumstances.

*Simms, Gerald,* and *Johnson* all dealt with the bizarre circumstance 1) where a greater inclusive offense actually carried a lower maximum penalty provision than did a lesser included offense and 2) where both were charged and tried. Those cases did not establish any "cap" in the abstract on simple assault specifically or on a lesser included offense generally. *Turner v. State,* 45 Md.App. 168, 172–73, 411 A.2d 1094 (1980). Their constraints came into play only when 1) the greater inclusive offense was charged and 2) jeopardy attached with respect to that greater inclusive offense. In *Simms,* for example, the first count (the "flagship" count) was for the then statutory felony of assault with intent to rob with a maximum penalty of ten years. The jury acquitted Simms of that charge and found him guilty, under the second count,

only of the misdemeanor of simple assault. His sentence of twelve years for the lesser crime is what prompted the examination of the ironic sentencing incongruity.

Under those circumstances, the State is deemed to have made a binding tactical decision that the greater inclusive offense will serve as the "flagship" count and that the maximum sentence for that flagship count will thereby serve as the sentencing "cap" for any lesser included offenses, even if those lesser included offenses have no "cap" of their own. If there is a conviction for the greater inclusive offense, all lesser included offenses merge into it and there is no problem. If, on the other hand, there is an acquittal, a hung jury, or a *nol pros* (after jeopardy) of the greater inclusive offense, the "cap" established by its earlier presence in the case nonetheless remains in force. *Walker v. State,* 53 Md.App. 171, 189–92, 452 A.2d 1234 (1982).

The principle established by the *Simms, Gerald,* and *Johnson* line of cases has nothing to do with the mere merger of penalties. *Spitzinger v. State,* 340 Md. 114, 125–30, 665 A.2d 685 (1995), articulates that principle, one whereby multiple convictions for different offenses do not formally merge but where multiple punishment is nonetheless sometimes prohibited. That phenomenon is not a constitutional one grounded in the Double Jeopardy Clause at all, but only involves a determination of legislative intent with respect to the permitted punishment of different offenses arising out of a single criminal incident.[4] *Walker v. State,* 53 Md.App. 171, 200–01, 452 A.2d 1234 (1982). In a case of merging penalties, moreover, it is the greater punishment, not the lesser, that prevails to establish the upper end of the permissible sentencing range. It is not, as it might be under *Simms,* a case of a lesser penalty imposing a "cap" on a potentially greater one.

---

4. Where, instead of limiting the penalty, the Legislature chooses to permit, or even to require, multiple punishment for related offenses arising out of the same criminal incident, as in the case of many handgun offenses, there is no constitutional impediment. *See also* Md.Code (1996 Repl.Vol.) Art. 27, § 36H–6; *Whack v. State,* 288 Md. 137, 143–50, 416 A.2d 265 (1980).

The *sine qua non* for the applicability of the *Simms, Gerald,* and *Johnson* principle is that the two crimes and respective maximum penalties involved in that sentencing symbiosis must be in the relationship to each other of a greater inclusive offense and a lesser included offense. In double jeopardy language, they must be "the same offense." The mere fact that they both arise out of the same criminal incident is immaterial; that factual common denominator only implicates the very different rule of *Spitzinger v. State,* 340 Md. 114, 665 A.2d 685 (1995). With respect to the symbiotic relationship necessary for the actual merger *of convictions, Simms v. State,* 288 Md. at 724, 421 A.2d 957, was clear:

> [W]e hold that when a defendant is charged with *the greater offense and a lesser included offense* based on the same conduct, with jeopardy attaching to both charges at trial, and when the defendant is convicted only of *the lesser included charge,* he may not receive a sentence for that conviction which exceeds the maximum sentence which could have been imposed had he been convicted of *the greater charge.*

(Emphasis supplied).

*Simms* further explained that the existence of such a relationship is determined by applying the "required evidence" test of *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932):

> This Court, along with most other courts, has consistently held that the only feasible test for determining *what is a "greater" and what is a "lesser included" offense* is the so-called "required evidence" test of *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), which focuses upon the elements of the crimes....While usually the "greater offense" under this test will represent the more heinous or aggravated crime, this is not always true.

288 Md. at 726, 421 A.2d 957 (emphasis supplied).

*Gerald v. State,* 299 Md. at 141, 472 A.2d 977, restated the special relationship between the two offenses with which *Simms* was concerned:

> *Simms* involved two offenses, a greater offense, assault with intent to rob, of which the defendant was *acquitted*, and *one* lesser included offense, simple assault, of which he was convicted.

(Italicized emphasis in original; other emphasis supplied). In applying the rule of *Simms*, the analysis in *Gerald* repeatedly made reference to the "greater inclusive" and the "lesser included" offense:

> Simple assault is a lesser included offense of both robbery and armed robbery. Like a little fish being eaten by a bigger fish which in turn is eaten by a yet bigger fish, simple assault is swallowed by robbery which then is swallowed by armed robbery. Therefore, had Gerald been *convicted* of armed robbery, the offenses of robbery and assault would have merged into the armed robbery, and he could have been sentenced only on the armed robbery conviction. Had he been *acquitted* on the armed robbery offense but *convicted* on the robbery offense, he could have been sentenced only on the robbery conviction. That is, upon *conviction* of a greater offense, a separate sentence may not be imposed on any lesser included offense.

299 Md. at 140–41, 472 A.2d 977 (italicized emphasis in original; other emphasis supplied).

The appellant is, of course, correct that **IF** the two charges now under our scrutiny were, indeed, in the symbiotic relationship to each other of a greater inclusive offense and a lesser included offense, the fact that the State *nol prossed* the greater charge before it was submitted to the jury would not compromise the appellant's argument for a penalty "cap." In rejecting the State's attempt to rely on such a *nol pros* to extricate itself from the rule of *Simms*, Judge Eldridge, in *Johnson v. State*, explained, 310 Md. at 694, 531 A.2d 675:

> A nolle prosequi during the presentation of evidence or after the close of evidence might be generated by the defendant's success in undermining the prosecution's case or in presenting a defense. The same defense success which leads to an acquittal might lead to a nolle prosequi on a greater charge before the case is submitted to the jury.

The anomaly pointed to in the *Simms* opinion, therefore, may arise when the greater charge is nol prossed.

*And see Walker v. State*, 53 Md.App. 171, 199–200, 452 A.2d 1234 (1982).

If the first-degree assault in this case should turn out to have been a lesser included offense within the greater inclusive charge of attempted manslaughter, the ten-year penalty "cap" should, indeed, have been applied. If, on the other hand, the first-degree assault in this case was not a lesser included offense, then there never was a penalty "cap" and the twenty-year sentence for the assault was properly imposed. What remains for us to consider, therefore, is the senior/junior relationship between those two offenses under the circumstances of this case.

### Attempted Manslaughter and First–Degree Assault:

### The "Same Offense" or Different Offenses?

The *dicta* in our earlier consideration of this case dealt with the question of whether two convictions—one for attempted manslaughter and the other for first-degree assault—should have merged. From the pleadings, the evidence, the jury instructions, the argument of counsel, and the verdict at that trial we could not tell, and our *dicta* suggested that where there is such ambiguity, the defendant should be given the benefit of the doubt under the "rule of lenity." Merger, however, is no longer an issue before us on this appeal because we are dealing only with a single pertinent conviction. There is nothing to merge. Ours is the very different question of whether to apply a penalty "cap" under the rule of *Simms*.

Notwithstanding the difference between the two issues, the merger cases are nonetheless very helpful to us. Both the merger cases and the penalty "cap" cases involve the common denominator first step of identifying what is a lesser included offense within the contemplation of *Blockburger v. United States*.

To apply the test of *Blockburger,* we list, side by side, the required elements of each criminal offense under scrutiny and

then compare the sets of elements. If one set is completely subsumed within the other, the crime represented by the subsumed set is deemed a lesser included offense within the other. Mergers or penalty "caps" would be appropriate, depending on the configuration of the convictions. If, on the other hand, each set contains a unique element not found in the other set, the offenses are distinct. If there are convictions for both offenses, one would not merge into the other. If charges are brought and jeopardy attaches with respect to both offenses, neither offense, whatever its subsequent fate, can impose a penalty "cap" on the other.

Attempted criminal homicide (murder or manslaughter) requires 1) an intent to kill the would-be victim, *Glenn v. State,* 68 Md.App. 379, 511 A.2d 1110 (1986), and 2) some step toward that end beyond mere preparation, *Gray v. State,* 43 Md.App. 238, 239, 403 A.2d 853 (1979).

Assault generally requires either an actual battery, an attempted battery, or an attempt to frighten (not here pertinent) as its basic element. *Lamb v. State,* 93 Md.App. 422, 613 A.2d 402 (1992). First-degree assault requires an additional aggravating element that may take either of two alternative forms. Article 27, § 12A-1 provides in pertinent part:

(a) *Serious physical injury; use of a firearm.*—(1) A person may not intentionally cause or attempt to cause serious physical injury to another.

(2) A person may not commit an assault with a firearm.

Looking first at attempted criminal homicide (murder or manslaughter), it is clear that the required *mens rea* of an intent to kill the would-be victim is a unique element that is not a required part of any form of assault in either of its degrees.

### Nightingale v. State
### And Multi–Form Offenses

As we turn our focus onto first-degree assault, however, we encounter the complicating presence of what Judge

William H. Adkins referred to in *Nightingale v. State*, 312 Md. 699, 705, 542 A.2d 373 (1988), as "a multi-purpose criminal statute." A second-degree assault may be aggravated upward to the first-degree level by either of two alternative factors. The variety of assault dealt with by subsection 12A–1(a)(1) would be subsumed within an attempted voluntary manslaughter. The intent to kill required for an attempted manslaughter clearly embraces the intent "to cause serious physical injury" required by subsection (a)(1). There is nothing in a subsection (a)(1) variety of first-degree assault that is not a required part of attempted voluntary manslaughter. In one of its forms, first-degree assault is a lesser included offense within attempted manslaughter.

That is not the case, however, with respect to a subsection (a)(2) variety of first-degree assault. Its requirement that the underlying assault be committed with a firearm is unique to it. Manslaughter, for its part, may be attempted by modalities or with instrumentalities other than a firearm, so there is no requirement that a firearm be used. The (a)(2) form of first-degree assault, therefore, is not a lesser included offense of attempted manslaughter. Neither would a conviction for it merge into one for attempted manslaughter nor would it be subject to any penalty "cap" established by the penalty for attempted manslaughter.

At first blush, the perplexing answer to the critical question before us seems to be that first-degree assault **BOTH IS AND IS NOT** a lesser included offense. That, of course, is not a satisfactory answer. Fortunately, *Nightingale v. State* shows us the way out of the dilemma. It tells us, 312 Md. at 705, 542 A.2d 373, that "[w]hen a multi-purpose criminal statute is involved, we refine it by looking at the alternative elements relevant to the case at hand." Quoting with approval from *Pandelli v. United States*, 635 F.2d 533, 537 (6th Cir.1980), it more fully explains:

> When, as here, a multi-purpose criminal statute is involved, *the court*

*must construct* from the alternative elements within the statute *the particular formulation that applies to the case at hand.* It should rid the statute of alternative elements that do not apply. It must, in other words, treat a multi-purpose statute written in the alternative as it would treat separate statutes. The theory behind the analysis is that *a criminal statute written in the alternative creates a separate offense for each alternative and should therefore be treated for double jeopardy purposes as separate statutes would.*

If, when we look at the applicable alternative elements, a lesser offense in effect becomes one of the elements of another offense, the *Blockburger* test is met.

312 Md. at 706–07, 542 A.2d 373 (emphasis supplied).

As *State v. Ferrell,* 313 Md. 291, 545 A.2d 653 (1988) made clear, moreover, the *Nightingale* analysis of a multi-form[5] crime applies, regardless of whether the omnibus crime that needs further particularization or pinning down is a statutory offense or a common law offense. As Judge Eldridge explained, 313 Md. at 298, 545 A.2d 653:

[W]hen *a common law offense or a criminal statute* is multi-purpose, embracing different matters in the disjunctive, a court in applying the required evidence test must examine "the alternative elements relevant to the case at hand."

(Emphasis supplied).

In *Nightingale,* the multi-purpose crime that caused the problem was the potentially greater inclusive offense of child abuse under Art. 27, Sect. 35A. That statute proscribed child abuse in either of two manifestations: 1) where the child sustained actual physical injury or 2) where the abuse was sexual in nature without regard to actual physical injury. The issue before the Court of Appeals was whether a series of

---

**5.** In terms of usage, we will refer to the Hydra-headed misconduct outlawed by a multi-purpose statute or by an equally variegated common-law prohibition as a "multi-form crime" or "multi-form offense."

second-degree, third-degree, and fourth-degree sexual offenses under Sects. 464A(a)(3), 464B(a)(3), and 464C(a)(1) were lesser included offenses, the convictions for which should have merged into the conviction for child abuse.

After examining the evidence, the jury instructions, the opening statements, and the closing arguments, it was clear that the convictions for child abuse, in both companion cases, were exclusively for the sexual variety of child abuse and had nothing to do with the physical injury variety of the crime:

> So far as child abuse is concerned, we can put aside any thought that these cases involve any aspect of child abuse based on physical harm or cruel physical treatment. At both Nightingale's and Myers's trials, the State's theory, as presented in opening statement, closing argument, and the court's instructions, was sexual child abuse.

*Nightingale v. State,* 312 Md. at 707, 542 A.2d 373.

For the merger analysis that followed, the physical injury form of the multi-form crime of child abuse was factored out as if it had never existed. Using the rule of lenity to resolve certain further ambiguities, the Court of Appeals concluded that the specific sexual offense conviction did, indeed, merge into the conviction for the sexual variety of child abuse.

That the determination of which form or forms of a multi-form crime is actually involved in any given case is the indispensable first step of any analysis was made very clear in *Snowden v. State,* 76 Md.App. 738, 747–48, 548 A.2d 165 (1988)(dissenting opinion by Moylan, J.):

> As Judge Adkins recently pointed out for the Court of Appeals in *Nightingale v. State,* 312 Md. 699, 542 A.2d 373 (1988), when dealing with a "multi-[form]" crime ..., a crime that may consist of different combinations of legal elements, *we do not even begin the comparing process* of deciding whether each contains an element not included in the other *until we first select the combination of elements*

*that we are dealing with in the context of that particular case.*

(Emphasis supplied).

In *Vogel v. State,* 76 Md.App. 56, 543 A:2d 398 (1988), this Court was dealing with the possible senior/junior relationship between child abuse and a specific third-degree sexual offense. We noted initially that the child abuse statute

provides, in the disjunctive, two forms of "abuse." The first, not here pertinent, is the causing of physical injury to the child through cruel or inhumane treatment. The second form of abuse, the only one remotely apposite to this case, is "sexual abuse of a child, whether physical injuries are sustained or not."

76 Md.App. at 60, 543 A.2d 398.

Before proceeding further with any *Blockburger* analysis, we had to decide whether we were dealing with only form A of child abuse or only form B or both. We explained, 76 Md.App. at 63, 543 A.2d 398:

*When a criminal offense comes in several different kinds, one does not even begin to catalogue the required elements until one has selected the kind of the offense applicable in a given case.* "When a multi-purpose criminal statute is involved, we refine it by looking at the alternative elements relevant to the case at hand."

(Emphasis supplied). We explained further, 76 Md.App. at 64, 543 A.2d 398, why the first determination would be dispositive:

It is clear that a sexual offense is subsumed within the "sexual abuse" species of the genus "child abuse," but not within the "physical injury" species, which involves no necessary sexual aspect.

In holding that a merger was compelled, we determined that the only form of child abuse possibly involved is the child abuse conviction under review was the sexual variety of that multi-form crime:

The only theory of abuse put forward in this case was "sexual abuse" in the form of a sexual offense, to wit, the act

of fellatio perpetrated by the appellant upon the child. Although the crime of child abuse might, in the abstract, be consummated by other modalities not involving the commission of a sexual offense, in this case the alternative form of the offense that was chosen and pursued did include that element.

76 Md.App. at 60, 543 A.2d 398.

### The Selection Process

### May Look Upward And/Or Downward

The fact that in the case now before us the multi-form crime that needs further particularization is the arguably lesser crime whereas in *Nightingale* and *Vogel* the multi-form crime in question was the arguably greater one is a distinction without a difference. The *Nightingale* analysis is just as necessary and works just as well whether looking upward or downward or, indeed, in both directions. The need for particularization does not depend on which rung on the ladder is occupied by the multi-form crime. It may well be that one form of crime B is a lesser included offense of one form of crime A, whereas other forms of both A and B are immune from such mandatory coupling.

### The Choices Are Not Mutually Exclusive

Another variation that can complicate a *Nightingale* analysis is that both prongs of a multi-form crime might be found to have been proved in a given case with one, but not both, of those forms possessing a unique element so as not to qualify as a lesser included offense. It is quite possible, as in the case now before us, that the answer to the "either ... or" question will not be in the disjunctive but in the conjunctive. In such a case, where the question "A or B?" yields the answer "Both," the conviction for the multi-form crime will not merge and the penalty for the multi-form crime will not be subject, under *Simms*, to a penalty "cap."

The combination of *Newton v. State*, 280 Md. 260, 373 A.2d 262 (1977) and *State v. Frye*, 283 Md. 709, 393 A.2d 1372

(1978) is instructive in this regard. Judge Eldridge's opinion in *Newton* was the pioneer analysis of the relationship between a conviction for first-degree murder and a conviction for a felony (or its attempt) possibly implicating one of the first-degree felony-murder statutes, Art. 27, Sects. 408, 409, or 410. *Newton*'s concern was with the risk of multiple punishment for the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment. *Newton* held that the predicate felony (or attempt) was a lesser included offense within a first-degree felony murder. The conviction for the predicate crime would, therefore, merge into the murder conviction because every element of the lesser crime was necessarily part of the required proof of the felony murder.

In applying *Newton,* a threshold problem that has to be faced is that murder in the first degree is a multi-form offense. The required aggravation, at least, is multi-form. No less than two aggravating circumstances may elevate ordinary murder to the first-degree level. One is the presence of a wilful, deliberate and premeditated intent to kill under Sec. 407. The coincidental commission of some other felony is immaterial to it. The other is that the killing was committed in the course of the perpetration (or attempted perpetration) of one of the felonies listed in Sects. 408, 409, and 410. If the theory supporting the first-degree murder conviction is felony murder and nothing else, the conviction for the predicate felony indisputably merges into the murder conviction. Conversely, if the rationale for the first-degree murder conviction is clearly that the killing was premeditated and nothing else, the issue of possible merger would not even raise its head:

> If, on the other hand, the murder conviction is premised upon independent proof of wilfulness, premeditation and deliberation under § 407, . . . the offenses would not merge. Each offense would then require proof of facts which the other did not, and convictions on both would be proper.

280 Md. at 269, 373 A.2d 262.

The two forms of aggravation are not mutually exclusive and *Newton* does not directly address the situation wherein

both supporting rationales are clearly established. Implicitly, however, *Newton* does provide the answer. If the first-degree murder conviction is based on a finding that both rationales have been proved, the doubling of the aggravation is superfluous. A finding as to a predicate felony is self-evidently not **REQUIRED** in such a case to sustain the first-degree murder conviction. As Judge Eldridge makes clear, 280 Md. at 269, 373 A.2d 262, *Blockburger*'s **REQUIRED ELEMENTS** or **REQUIRED EVIDENCE** test only comes into play when every element of the lesser offense subject to merger is literally and absolutely **REQUIRED**:

> [T]o secure a conviction for first degree murder under the felony murder doctrine, the State is *required to prove* the underlying felony and the death occurring in the perpetration of the felony. The felony is *an essential ingredient* of the murder conviction. The only additional *fact necessary* to secure the first degree murder conviction, which is *not necessary* to secure a conviction for the underlying felony, is proof of the death. The *evidence required* to secure a first degree murder conviction is, absent proof of death, the same *evidence required* to establish the underlying felony. Therefore, as only one offense *requires proof* of a fact which the other does not, under *the required evidence test* the underlying felony and the murder merge.

(Emphasis supplied). The emphasis is on the participle **RE-QUIRED**. When a conviction can stand on its own without a second supporting rationale, the second rationale (though welcome) is not **REQUIRED**.

What was implicit in *Newton*, Judge Eldridge made explicit in *State v. Frye*, 283 Md. at 716, 393 A.2d 1372:

> Although we held in *Newton* that felony murder and the underlying felony are to be considered one offense for purposes of multiple punishment, and therefore the underlying felony would merge into the felony murder conviction, we also emphasized that *if a first degree murder conviction is premised upon independent proof of wilfulness, premeditation and deliberation* under Art. 27, § 407, *then the murder, even though committed in the course of a felony,*

*would not be deemed the same offense as the felony,* and there would be no merger. "Each offense would then require proof of facts which the other did not, and *convictions on both would be proper.*"

(Emphasis supplied).

### First–Degree Assault:
### Form A or Form B or Both?

The first-degree assault conviction in this case was indisputably supported by both alternative theories of aggravation. Both theories were presented by the State in its opening statement. Both theories were abundantly supported by the evidence. As to the use of a firearm, three State's witnesses testified that the appellant fired four or five shots. The appellant himself testified that he fired a gun. A bullet broke the victim's leg. Three other bullets hit the victim in the back.

In closing argument, the prosecutor presented both theories of aggravation to the jury. With respect to the use of a firearm, he argued:

With regard to the second question that you are asked on the verdict sheet, Judge Johnson asked, is the Defendant guilty or not guilty of first degree assault? That is, *did the Defendant intentionally shoot Edward Tyrone Johnson four times* as a result of an intentional or reckless, but not accidental act?

*The answer is yes to that.* He's guilty. *Mr. Johnson told you how many times he was shot. The medical records are in evidence.* You can take a look at them yourself, and it was intentional.

(Emphasis supplied).

Judge Johnson instructed the jury as to both theories of aggravation. With respect to the use of a firearm, he explained:

Secondly, the Defendant is charged with first degree assault under a different theory. In this particular case, *the*

*State must prove to you beyond a reasonable doubt that the Defendant used a firearm to commit an assault. That is, the Defendant used a firearm to commit the assault.*

(Emphasis supplied).

Quite aside from the fact that the jury found the appellant guilty of the use of a handgun to commit a crime of violence, the jury returned separate findings of guilty as to each theory of aggravation necessary to raise assault to the first-degree level. Questions two and three, respectively, dealt with those separate forms of aggravation. The jury's double verdict as to first-degree assault was:

THE DEPUTY CLERK: As to question number two, is the Defendant guilty or not guilty of first-degree assault?

THE FOREMAN: Guilty.

THE DEPUTY CLERK: As to question number three, is the Defendant guilty or not guilty of first-degree assault?

THE FOREMAN: Guilty.

Unlike the situation in the first trial, discussed in *dicta* in our first opinion, there was no ambiguity on this occasion as to the basis for the jury's verdict of guilty on the charge of first-degree assault. There was no vagueness calling for resolution under the rule of lenity. The hypothetical possibility discussed in the *dicta* never came to pass.

Allowing for a modest linguistic adjustment because we are here applying the *Nightingale* analysis by looking downward at a multi-form crime that was arguably a lesser included offense rather than upward at a multi-form crime that was arguably a greater inclusive offense, it is clear that the variety of first-degree assault that would merge into a conviction for attempted voluntary manslaughter was **NOT REQUIRED** to sustain the first-degree assault conviction here. That conviction rested, albeit redundantly, on an independent basis. That independent rationale, moreover, had a unique element, the use of a firearm, **NOT REQUIRED** to prove attempted voluntary manslaughter.

The first-degree assault in this case was not a lesser included offense of attempted manslaughter and was not, therefore, subject to any penalty "cap" under the rule of *Simms* by virtue of attempted manslaughter's earlier presence in the trial after jeopardy had attached.

## Lesser Included Offenses
### Under *Hook v. State* and *Hagans v. State*

Having settled the penalty-cap issue, we find, fortunately, that we have already done our homework for the appellant's final contention. The appellant invokes *Hook v. State*, 315 Md. 25, 553 A.2d 233 (1989), for the proposition that the State should not have been permitted, over his objection, to *nol pros* the attempted manslaughter charge with its maximum penalty of ten years. Without mentioning it by name, the appellant, in a variation on the theme of *Hook*, also invokes *Hagans v. State*, 316 Md. 429, 559 A.2d 792 (1989), for the proposition that even if attempted manslaughter had never been a charge in this case, he was nonetheless entitled to have the jury instructed as to it.[6]

As a threshold matter, these cases only apply when the count to be shielded from the *nol pros*, per *Hook*, or the uncharged offense to be brought to the jury's attention as the possible basis of an alternative conviction, per *Hagans*, is a lesser included offense. The clear holding of *Hook* establishes a limitation on the State's prerogative to *nol pros* a charge only when that charge is a lesser included offense within a greater inclusive offense that is being submitted to the jury.

---

**6.** In this case, where a *nol pros* was actually entered, it would appear that the appellant would have to rely on *Hook* and not on the *Hagans* variation. As *Hagans* explained its own limitations, 316 Md. at 455, 559 A.2d 792:

> [W]here the State enters a *nolle prosequi* as to an uncharged lesser included offense, ... it would obviously be inappropriate to submit the lesser included offense to the jury, except to the extent that the defendant desires and is entitled to have it submitted under principles recently set forth in *Hook v. State* [.]

As Judge Orth set out the full impact and applicability of *Hook,* 315 Md. at 43–44, 553 A.2d 233:

> When the defendant is plainly guilty of some offense, and *the evidence is legally sufficient for the trier of fact to convict him of either the greater offense or a lesser included offense, it is fundamentally unfair* under Maryland common law for the State, over the defendant's objection, *to nol pros the lesser included offense.* . . . [I]t is simply offensive to fundamental fairness, in such circumstances, to deprive the trier of fact, over the defendant's objection, of *the third option of convicting the defendant of a lesser included offense.* And if the trial is before a jury, the defendant is *entitled,* if he so desires, *to have the jury instructed as to the lesser included offense.*

(Emphasis supplied).

At the very outset of the *Hagans* opinion, 316 Md. at 433, 559 A.2d 792, Judge Eldridge stated the issue before the Court:

> It is *whether,* as a matter of Maryland common law, *a defendant* ordinarily *can be convicted of* an offense which is not charged but which is *a lesser included offense of the one that is charged.*

(Emphasis supplied).

The legal analysis of the *Hagans* opinion constantly reiterated that the subject of that analysis was an uncharged lesser included offense:

> *The principle that a defendant, charged with a greater offense, can be convicted of an uncharged lesser included offense,* has been adopted by virtually every jurisdiction in the United States which has passed upon the issue. . . . .
>
> The rationale underlying *the lesser included offense doctrine* was well stated in *Note, Lesser Included Offense Doctrine in Pennsylvania: Uncertainty in the Courts,* 84 Dick. L.Rev. 125, 126 (1979)[.] . . .
>
> Since the rule permitting *a conviction on an uncharged lesser included offense* was well-established at common law, is accepted throughout the United States today, and gener-

ally promotes a just result in criminal cases, we shall adhere to it.

316 Md. at 447–48, 559 A.2d 792 (Emphasis supplied; footnote omitted).

*Hagans* then held, 316 Md. at 449–50, 559 A.2d 792, that the *Blockburger* test would be used to determine what charges qualified as lesser included offenses:

> Under the "required evidence" or "elements tests," courts look at the elements of the two offenses in the abstract. *All of the elements of the lesser included offense must be included in the greater offense.* Therefore, *it must be impossible to commit the greater without also having committed the lesser.*

\* \* \*

> We agree that *a defendant may only be convicted of an uncharged lesser included offense if it meets the elements test.*

(Emphasis supplied; footnote omitted).

Judge Eldridge further explained, 316 Md. at 453, 559 A.2d 792, that the "lesser included offense doctrine" could work for the benefit of a defendant as surely as for the benefit of the State.

> Although *the lesser included offense doctrine* developed at common law largely for the benefit of the prosecution, it may now also be invoked by the defendant.... In *Keeble v. United States[*, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844] (1973), the Supreme Court indicated that not allowing the defendant the right to request *an instruction on a lesser included offense* might violate the Due Process Clause of the Fifth Amendment of the United States Constitution. And in *Beck v. Alabama[*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)] ..., the Court held that before the imposition of the death sentence, *the jury must be*

*allowed to consider a lesser included offense* if the evidence warrants it.

(Emphasis supplied).

The one characteristic that the *Hook-Hagans* line of cases shares with the compulsory merger cases and the penalty "cap" cases is that necessity for identifying what is a lesser included offense. As we have already established at great length, there was no lesser/greater symbiotic relationship in this case between the first-degree assault conviction and the charge of attempted manslaughter that the appellant wanted to have either salvaged or resurrected. Even had attempted manslaughter remained in the case, neither the conviction nor the sentence for first-degree assault would in any way have been affected.

Even if, moreover, we were to assume, *arguendo,* that such a lesser/greater relationship existed between first-degree assault and attempted manslaughter, the attempted manslaughter charge would have been the greater charge, not the lesser. The appellant attempts to apply *Hook* and *Hagans* to something other than a lesser included offense. The appellant actually turns *Hook* and *Hagans* upside down. There has never been a suggestion that *Hook* would in any way inhibit the *nol pros* of a greater charge or that *Hagans* would in any way mandate an instruction as to a greater crime than the one submitted to the jury. The fundamental rationale of those cases simply does not apply.

The rule of those cases, moreover, just won't work when turned upside down. Even to suggest, for example, that, under *Hagans,* a jury could return a verdict of guilty of attempted manslaughter on a count that only charged first-degree assault is, on its face, an absurdity. Where would the *mens rea* of a specific intent to kill come from? A defendant cannot be convicted of something with which he has not, even implicitly, been charged.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**